MILLER, Judge.
As authorized by Section 19.1 of Article VI of the Louisiana Constitution and by LSA-R.S. 48:441-460, the Louisiana Department of Highways expropriated certain property in the Parish of Lafayette for the construction of Interstate Highway I — 10. Landowners, insofar as we are here concerned, were Charles A. Patout, Lawrence C. Richard and Vermilion Development Company, Inc. The two expropriation suits were consolidated for trial and appeal purposes, and we are handing down separate decrees. See 236 So.2d 53 for the decree in the Vermilion Development Company, Inc. case.
In accordance with the November 18, 1964 order of expropriation, the Highway Department deposited $58,800 for the properties owned by Patout and Richard, and $115,350 for the properties owned by Vermilion Development Company, Inc. Defendants withdrew the deposits in December, 1964, and answered demanding $522,458.43 and $115,900.00, respectively. In April, 1965, the Highway Department amended its pleadings to reduce its tenders of damage to defendants to the sum of $34,830 and $18,074, respectively.
After ten days of trial during June and July of 1965 and after taking the cases under advisement, the trial court handed down written reasons awarding $137,178 to Patout and Richard and $128,141 to Vermilion Development Company, Inc. The Highway Department appealed and defendants have answered both appeals seeking an increase in the award to Patout and Richard to $218,738 (subject to credit for $58,800 previously deposited) and to Vermilion Development Company, Inc., to $145,275 (subject to credit for $115,350 previously deposited).
The issues are: (1) Did landowners purchase the expropriated lots and construct five houses (on six of these lots) in bad faith with the sole purpose of enhancing an award of damages to them? (2) What is the effect of the development contract executed and recorded in 1958? (3) What is the value of the property expropriated? and (4) What is the value of the severance damages ?
The following statement of facts by the trial judge has been accepted by the parties. The parenthetical additions are substitutions or additions by the writers.
“It is stipulated by and between counsel that a public notice of a public hearing to be held in Lafayette, Louisiana was published in The Advertiser, a Lafayette newspaper, on September 10, 1959; further that the public hearing regarding the contemplated construction of I — 10 through the Lafayette area was held in Lafayette, Louisiana on October 6, 1959.
“It was further stipulated that the salvage value of the 5 houses expropriated from Vermilion Development Company, Inc. was $17,760.00.
*42 “The property owned by defendants and involved in this case is located partly in the Richter Park Subdivision of Lafayette Parish, Louisiana, and partly in property located adjacent thereto and included in a proposed future extension of such subdivision. The property involved in (the Vermilion Development case) is improved and the property involved in (the Patout and Richard case) is unimproved. Plats of survey showing the properties involved in the taking are attached to both suits as Exhibit P-3.
“Originally, A. A. Richter and Robert H. Richter owned a rectangular shaped tract of land containing 108.82 acres. They had a partition of this property with A. A. Richter taking the north one-half thereof and Robert H. Richter taking the south one-half. Shortly thereafter, and on the same day, September 16, 1958, both Rich-ters entered into separate but similar development contracts with. Charles Patout and Lawrence Richard under the terms of which they obligated themselves to sell their land to such developers at the rate of $2,000.00 per acre in exchange for the development of such land into a residential subdivision.
“Contemporaneously with the above transaction, Richard, Charles Patout and his brother, Eugene Patout, created the Vermilion Development Company, Inc., which corporation was owned by the three men in the proportions of one-third to each. The corporation was to purchase property from the developers as lots and build homes on them which it was to sell to the general public.
“The original plan was to develop the property covered by the development contracts in a prudent, orderly, and efficient manner. The first subdivision created on December 3, 1958 was called Richter Park Subdivision and consisted of a street running north and south called Richter Drive with building plots on either side having dimensions of approximately 60 feet fronting on said street by a depth of approximately 105 feet. Approximately in the center of Richter Drive was Julie Drive, which began on the west line of Richter Drive and extended westward. Richter Drive above and below Julie Drive was called North and South Richter, respectively. The plan operated as expected and in due time the lots in the subdivision were sold to the corporation (which) constructed homes on such lots and sold them to the general public.
“In time, the need for additional lots arose and on September 11, 1959, Richter Park Subdivision, Extension No. 1 was created. Julie Drive was extended further westward, and North and South Orleans Drive was created with lots on either side thereof similar in size and plan to that employed in the original Richter Park Subdivision. There was also created at this time, Covington Drive and Hammond Road at the north and south ends thereof respectively.
“The same need for additional lots prompted the creation of Richter Park Subdivision, Extension No. 2 on February 22, 1962, with Julie Drive, Covington Drive and Hammond Road being extended still further westward and the creation of North and South May Drive as the main street of this extension. Lots size and shape were similar to the two preceding subdivisions.
“Subsequent thereto Albert A. Richter and Robert Richter sold to Charles A. Patout and Lawrence C. Richard all of the property owned by them located south of the proposed extension of West Julie Drive up to the railroad right-of-way so that at the time of the taking, (Patout and Richard) owned all of the property located south of West Julie Drive.
“During this period of time, Louisiana Highway No. 3052 (US 167) was created, being located just to the east of the Richter Park Subdivision complex. The interchange or intersection of this highway with *43 the proposed Interstate Highway 10 was so located that the westerly leg thereof, having a right-of-way 300 feet in width, extended into the Richter Park Subdivision to a point located midway between North May and North Orleans Drive or on a line running north and south and located on the rear or back lot lines of lots facing North Orleans Drive and North May Drive.
“Properties owned by defendants herein and affected by such intersection were acquired from them by plaintiff by voluntary sales, (recorded Aug. 1, Sept. 6 and Sept. 27, 1961) copies of which are on file in these proceedings.
“On January 29, 1963, Charles A. Patout and Lawrence C. Richard purchased from A. A. Richter, 61 lots, 6 of which were located in the Richter Park Subdivision, Extension No. 2, and 55 of which were located in the undedicated and unimproved portion of the Richter tract scheduled for eventual development as a residential subdivision. All of these lots, without any exception whatsoever, were located completely within or were partially affected by the right-of-way of Interstate 10.
“Counsel for the Department argues that the defendants acquired knowledge of the location of the right of way prior to the taking, and in anticipation of that taking acquired from the owner just that property located within the right-of-way and, therefore, were unjustly enriched at the public expense. Bad faith is contended in its effort to deny to defendants the compensation they seek, or the amount first deposited when this suit was filed.
“It is argued that (since) the interchange or intersection of U. S. I — 10 with La. State Highway 3052 (US 167) was located just east of the Richter Park Subdivision * * the defendants realized that the price then being paid to landowners was good and they set about making plans to get as much money as they could when the State came to buy property for the Interstate continuation westward over and across this property. It is said in brief that defendants’ maneuver was to gain the sympathy of this Court. Counsel argues further that a strip map of I — 10 was supplied by the Department and was interlaid over a plat of the subdivision enabling defendants to determine exactly where the highway would run. This was (furnished in 1961). Further, the Department asserts that the center line of the highway was established in March of 1959 by the placing of stakes which could be clearly seen by all viewers.
“The defendants asked the Department if it needed any further right-of-way as of August 5, 1961, but Counsel contends that this was ‘to complete the position of innocence of themselves’ and that the reply by the Department which read in part as follows: ‘We do not contemplate the acquisition of any further right of way in your subdivision, for the proposed Lafayette Intersection,’ made it clear that the (letter referred to) the intersection only.
“Counsel then attacks the purchase by Patout and Richter of the 61 lots in (January of) 1963 as being an integral part of the scheme to unjustly enrich themselves at the public expense. They then knew, the Department says, that the highway was to occupy this identical area. The construction of the residential houses on 5 of these lots of a value above those in the general area is another indication of bad faith, suggests the Department. The construction of these houses commenced in March, (or April) 1964.
“The testimony of Albert A. Richter is referred to in support of the State’s position and he is quoted to say that Mr. Patout told him he wanted to buy the lots to make money on the Highway Department. This Mr. Richter, it is noted, is the same Albert Richter who settled his case with the Department and then attempted to intervene in these suits, making substantially the same contentions as the Department.
*44 “Defendants argue that they were guilty of none of the accusations made by the Department of Highways. They insist that they were acting in the normal and customary course of development in subdividing property for resale. They were, in fact, experienced men in the real estate business and had developed other subdivisions before. It is vehemently denied by Mr. Patout and all others concerned that they knew where the highway was to pass and schemed to unjustly enrich themselves by virtue of this knowledge.
“Counsel for defendants argues that the Department knew just where the highway was to be but took no affirmative steps to prevent the defendants from developing the land adversely to their interest. Mr. Louis Smith, employee of the Department of Highways, stated that he ran the center line of I — 10 through the subdivision area and placed stakes every 100 feet some time in March of 1959 but permanent markers were only placed in the center of the railroad track to the west. He further stated that unless a person had access to field survey notes it would be difficult to locate these permanent markers. Neither the defendants nor their engineers had access to this information.
“Mr. Frank Chachere, surveyor for the Highway Department, said that he saw about 2 blocks of the subdivision developed in 1959. He states that he sent this information to the Department.
“Mr. Henry McBride, a right-of-way agent for the Department, stated that if construction is going on on the right-of-way it is usual to ask the owner to stop.
“Mr. Robert Bethea, Assistant Right-of-Way Agent for the Department, states that the vicinity maps available in 1959 did not show the exact location of the proposed rights-of-way. He went on to explain that where construction is going on in an area contemplated to be taken that they attempt to notify the owners not to incur additional expense. There can be some purchasing before the project is approved but only in cases of protective buying where construction is known to exist or to be commenced or in hardship cases to protect the individual.
“Mr. L. J. Lejeune, Review Appraiser for the Department, acknowledged that he had received a letter from Mr. Eugene Patout, President of Vermilion Development Company, requesting knowledge of the location of the right of way, and he had replied to the same. These letters are significant and are copied here in full.
“ ‘August 5th, 1961
Mr. Lejeune
Louisiana Department of Hy.
Land Appraisal Department
Baton Rouge, Louisiana
RE: Richter Park Subdivision and Richter Park Ex. #2
Lafayette, Louisiana
Dear Sir:
Due to contractual commitments on the above captioned subdivision (s), and work now being done not only by our corporation, but by the developers, Patout-Richard Agency, the time has come where it is imperative that we begin negotiations on any other right of ways that the state and/or state-federal projects might intersect the above captioned property.
We will suffer grave damages in our development of the property unless we can effect sale to you on any other property which you might need for your projects.
Relocation of water lines, sewer lines, etc, on our part, and the possible relocation of streets (now being paved) as well as existing drainage and engineering could cause us irreparable harm.
We have been advised by our attorneys to notify you immediately of the situation as *45 it exists today, and to request that you submit for an amicable settlement for future ROWs as a necessary expedient so that damages to us will be minimized.
Please acknowledge this letter by early mail, as it is impossible for us to stop our operations upon the ASSUMPTION that Interstate No. 10 MIGHT intersect our development.
Yours very truly,
VERMILION DEVELOPMENT CO. INC.
BY: /s/ EUGENE W. PATOUT
Eugene W. Patout, President
EWP/c’ ”
“ ‘August 17, 1961
F.A.P. 1-10-2(12) 101
STATE PROJECT 450-05-03
LAFAYETTE INTERSECTION
LA. 3052 INTERSTATE HWY.
LAFAYETTE PARISH
Mr. Eugene W. Patout
President
Vermilion Development Co., Inc.
122 N. Richter Drive
Lafayette, Louisiana
RE: RICHTER PARK SUBDIVISION & RICHTER PARK EX. #2
LAFAYETTE, LOUISIANA
Dear Mr. Patout:
In reply to your letter — of August 5, 1961- — - and also our telephone conversation this date, please be advised that I have discussed this matter with our Enginering Department and we do not contemplate the acquisition of any further right of way in your subdivision, for the proposed Lafayette Intersection. As far as can be determined, our Construction Plans are complete and we have — as of this date — acquired all right of way necessary for the construction of this project.
If we can be of any further assistance to you, please feel free to call upon us.
Yours very truly,
/s/ L. J. LEJEUNE
L. J. LEJEUNE
REVIEW APPRAISER
LJL/mep’ ”
“Having heard nothing from the Department subsequent to this communication, 5 homes on the 2 tracts involved in (the Vermilion Development case) were begun in March and April of 1964. Mr. Patout stated that they were constructed because he felt the market was such that this type home could be sold. In July of 1964 he was told by Mr. Maurice Chappuis, one of the appraisers for the Department, that the highway was to come through Richter Park. At this time the fifth home on these five lots was possibly 95% (or 99%) completed. Mr. Chappuis advised him that someone from the Highway Department would contact him and Mr. McBride later on did contact him. He thereupon discontinued all construction in the subdivision, and within the limits which he then understood the highway would encompass. After he received the July 24, 1964 letter from Mr. Cope, he states that he discontinued operations but immediately started new construction in a different area of the subdivision. These houses were in the price range of $20,000.00 and upward.
“The July 24 letter referred to above reads as follows:
“ ‘July 24, 1964
STATE PROJECT NO. 450-04-03
F.A.P. NO. 1-10-2(12) 101
LAFAYETTE-INTERSECTION-La 3052 Highway
ROUTE 1-10
LAFAYETTE PARISH
Vermilion Development Company, Inc.
100 North Richter Drive
Lafayette, Louisiana
*46 ATTENTION: Mr. Eugene W. Patout,
President
Dear Mr. Patout:
As you have previously been advised by Mr. Henry H. McBride of our Lafayette District Office, the Department is contemplating the acquisition of property for the above captioned project in the near future. This project will involve the construction of a portion of Route I — 10 through Richter Park Subdivision within the confines of your ownership.
We are not concluding our survey of the area required from your ownership. Survey crews on the ground are taking topo-graph and this, when plotted, will complete the property map of Richter Park. We also have professional Real Estate Appraisers in the area developing the necessary data to finalize in appraisal of the area required from you.
It is anticipated that all data will be processed in sufficient time to permit us to begin formal negotiations about August 1, 1964. This, of course, is a tentative date assuming development of no unusual difficulties.
Inasmuch as the development of a complete survey map and appraisals of a highly developed area such as Richter Park is a very complex operation, we request that you delay construction of additional improvements within the required area until negotiations for the required area can be concluded. We will, of course, expedite our acquisition process as much as possible in this instance.
Your cooperation in this matter will be greatly appreciated. Should you desire any additional information in connection with this project, please do not hesitate to call on us.
Yours very truly,
/s/ GENE N. COPE
GENE N. COPE
SENIOR RIGHT OF WAY AGENT
GNC: sbz’ ”
To these facts we would add that the landowners had a plat prepared in 1961 by their engineer, Mr. Roland Laurent, for the purpose of showing which lots might be taken for Interstate 10. This plat showed that the 61 lots (later) purchased by Patout and Richard would be affected, and that some 230 lots would not be within the right of way. This 1961 projection almost exactly traced the right of way expropriated in 1964. When it is noted that in 1961 these same landowners sold property for and had plats showing that the I-10-US 167 interchange would have to feed I — 10 traffic across the Richter subdivision, it is easily understood how the landowners’ engineer accurately projected the right of way boundaries.
The record is replete with testimony, even from the landowners, that they knew or were almost certain that I — 10 was going to cross Richter Park so that it would join the west leg of the I — 10 and US 167 intersection. We note again that the western terminal of this intersection was in Richter Park and add that in the 1961 amicable sale of right of way, the Department purchased some slabs which had been laid for construction of houses.
In January of 1963, when Patout and Richard purchased the 61 lots that blanketed the right of way (which is the subject of this taking), their subdivision development had approximately 100 homes built and sold (occupying 100 lots). They had on hand approximately 130 lots (most of which were undeveloped). Furthermore, they could have selected another 100 lots that the Richters were obligated to sell to them. Some of these 100 lots were covered with beautiful trees.
On cross-examination, Mr. Patout was pressed to explain just why he selected the lots which blanketed the right of way and no others. After stating that his engineer did a good job projecting the right of way lines, he was asked (Tr. 328, 9):
“Q. Was the fact that they were located within this projection by chance, by design or by coincidence?
*47 “A. The only way I can answer that, sir, is to tell you that in the developing business one must be very careful how he outlines and develops his property. An intelligent developer who makes money doing it has a tough time. He must consider all possibilities. But, he doesn’t have to be a mind reader for this statement.
“Q. So you’re telling us that this purchase of the lots located in what you thought might be a right of way was the intelligent decision you made at that time?
“A. I — I—I agree it was an intelligent —the intelligent decision to make at that time, since I wanted to buy all of the property. And Mr. Richter wouldn’t sell it to me.”
The offer to buy all the property was conditioned on Richter selling it on credit.
Mr. Richter testified that the January 1963 sale of 61 lots was a credit sale with his $2,000 per acre payment due after the Highway Department would pay Patout and Richard. But later in 1963, the purchasers came to him and paid cash for the acreage included in the 61 lots and took back their written agreement to pay after the Highway Department paid them. He also testified that at the time of the sale, the purchasers stated that they wanted to make a lot of money from the Highway Department. At that time, he showed them the centerline stakes placed by the Highway Department survey crews.
The trial court apparently discredited Mr. Richter because he later attempted to intervene in the litigation on the side of the Department. But we note in one of the landowners’ exhibits (D-60) that their attorneys referred to a January 29, 1963 agreement by Patout and/Richard whereby they “agreed to move' (Richter’s) home from the property they purchased to a location to be designated by you, when and if the Highway Department began expropriating the property for highway purposes.” Richter’s home was on lots 299 and 298, both of which were in Laurent’s 1961 projection of where I — 10 would be located and both of which were in the 61 lots purchased by Patout and Richard in January 1963.
Turning now to the five houses built by Vermilion Development. Construction was commenced in March or April of 1964. Carpenters did some of the work at night and the bricklayers worked in the rain under the cover of visqueen provided for their protection from the weather. Tr. 283. These houses were built within 200 feet of the property sold by landowners for the I-10-US 167 interchange. Four of the five houses were built unusually close to one another and the houses are entirely within what obviously had to be taken for the right of way. They were arranged in such a way that they formed a total barricade to the western entrance and exit of the interchange.
Houses built in the subdivision before this time were for the $10,000 to $15,000 market. But these houses were built to sell for approximately $30,000. The developer did not produce a single receipt to show cost of the five houses.
The President of Vermilion Development testified that he knew more about the corporation’s affairs than anyone else. He explained that this location was chosen without any thought that I — 10 might need this property. Instead he was motivated to place these more expensive homes in a separate area. He explained:
“ * * * We felt there was a demand for larger homes on the north side of Lafayette. Any, any intelligent developer is not going to go into an area where he might have, let’s say, reasonably priced, twelve, fourteen, fifteen thousand ($15,-000) dollar homes and build a twenty-five or thirty thousand ($30,000) dollar home *48 next to it. What he’s going to do is pick a separate area and develop that into an area of its own. This particular area you’re referring to — If we visit Richter Park, you see it’s covered with gorgeous trees — pine trees, oak trees. And, it’s the most attractive section of it. Now, when I was stopped from building, I was forced to go back into the area where I had smaller homes and construct larger homes. And, I did construct larger homes in there. And, I did sell them. But, normally, that’s not the general procedure that’s followed.” Tr. 292.
A review of the photographs in evidence shows that these homes were not built in the area where trees are to be found. The trees are further removed from the intersection, and most are located outside Laurent’s 1961 projection of the right of way.
All experts who ventured an opinion on the subject opined that it was not good business judgment to build all five houses so close together.
The trial court did “not believe the defendants in these cases have acted in bad faith.” This conclusion was based in part on Vermilion Development’s letter of August 5, 1961, together with the Highway Department’s answer of August 17, 1961. Vermilion Development’s president showed these letters to some of his prospective customers to show that I — 10 would not take any other land from Richter Park Subdivision. On the other hand, an employee of Vermilion Development testified that they also used Laurent’s 1961 projection to show that I — 10 would go through Richter Park Subdivision. The President did not deny that he had Laurent’s 1961 projection displayed on the wall of his office.
We do not agree that the quoted letters establish that the Department of Highways placed itself on record that it would not take additional right of way from Richter Park I — 10. The Department’s letter specifically states that they would not take any other right of way for the “proposed Lafayette Intersection,” Landowners knew that they had sold right of way for that intersection only one month before.
We can appreciate their need to get the information requested from the Highway Department in their letter of August 5, 1961. Obviously it would be desirable, both for landowners and the public, to have the Department buy all rights of way at the same time. The plain fact of the matter is that funds were not available for this purpose.
The Highway Department has established that the defendants knew with a high degree of certainty exactly where I — 10 would be located at the time they exercised their right to purchase the land involved and when Vermilion Development constructed five houses on six of these lots. We are compelled to agree with the statement in the Highway Department’s brief, that the construction of the five houses was “quite obviously a final further effort to exact additional profit from the public’s efforts to build highways.” We find that defendants’ purchase of the lots in question and the construction of the five houses was in bad faith and with the sole purpose of enhancing an award of damages to them. The trial court’s determination to the contrary is manifestly erroneous.
A landowner who buys land or makes improvements within an area he knows will be required for a public improvement is entitled to be compensated for the land at an amount no greater than he paid and to be compensated for the improvement at an amount no greater than the salvage value of the improvements. State Through Dept. of Highways v. Laird, 219 La. 567, 53 So.2d 674, 676 (1951); 29A, C.J.S. Eminent Domain § 175(1), p. 748; Eminent Domain, § 294, 27 Am.Jur.2d 105, 6.
Landowners argue that the Laird case is not in point in that the expropriation proceedings had been filed on June 4, 1947, *49 and the landowner purchased the property on August 5, 1948; and that there the landowner was specifically warned by the Highway Department before he made the improvements. Additionally, landowners contend that in Laird, the landowner was awarded the market value of his land. But we find no discussion of market value in the opinion. The Supreme Court reduced the award for the value of the land from $813 to $243.90 as suggested by the Department.
When the Laird case was filed, the Department acquired no title, right or interest in the land being expropriated until the judgment of expropriation was granted and the award paid. The original landowner sold the property after suit was filed but before judgment of expropriation was rendered. The court stated that the record was not clear but apparently found that the purchasing landowner did not know of the pending expropriation when he agreed to purchase the land. But he learned about it shortly thereafter and he received notice from the Highway Department not to make improvements. Notwithstanding this notice he constructed a garage and made other related changes in the property. The Supreme Court reversed the trial court’s allowance of $342 “for removing and reconstructing the (new garage) and for rebuilding his driveway.” This holding was made in answer to the Department’s assignment of error “(2) That since defendant (landowner) had been notified that the suit was pending before he constructed the garage, he is not entitled to recover its value; * * 53 So.2d 674, 675.
We find the Laird case exactly in point. When Laird made the improvements he knew that the property was likely to be expropriated, and it was held that he could not recover for improvements made thereafter. We find that here, defendant landowners had knowledge of the Highway Department’s need for the property which they purchased in January of 1963 and on which they commenced construction of five $30,-000 houses in March and April and completed construction in June and July, 1964.
Because of its bad faith Vermilion Development is only entitled to the $17,-760 (stipulated) salvage value of the five houses together with the cost of the six lots on which the five houses were located. This purchase price is difficult to determine because payment was made with shares of stock in Vermilion Development. We find that Vermilion Development’s cost was $11,520 for the six developed lots. The trial court’s award to Vermilion Development is reduced to $29,280.00. All costs both at trial and on appeal are taxed to Vermilion Development Company, Inc.
The Highway Department contends that this ruling disposes of the claim of Patout and Richard, arguing that they are entitled to recover only their $2,000 per acre cost of the land expropriated. We would agree except for the fact that before these developers purchased the land involved, they owned a right to acquire it at that price. This right was obtained by contracts (D-38, D-39) executed and recorded before there was any suggestion that the land might be needed for highway improvements.
On this same issue the trial court awarded severance damages to Patout and Richard for lands in the subdivision, north of I — 10, which according .to all experts suffered severance damages. These lands were still owned by Richter, but were subject to the recorded 1958 agreement by Richter to sell to Patout and Richard at $2,000 per acre.
The Highway Department seeks to overturn this finding contending that damages cannot be awarded to a party who does not own land, since suit can be brought only against the “owner” and only the “owner” is assured just compensation, citing LSA-R.S. 19:2; Art. 1, Sec. 2, and *50 Article 6, Sec. 19.1, Louisiana Constitution of 1921.
No cases have been cited and none found in Louisiana which pass on this question. Generally, compensation must be made for all kinds of property, and every kind of interest in property which has a market value. 29A C.J.S. Eminent Domain § 104, p. 416. Under the terms of this development contract (the validity of which has not been challenged), Patout and Richard have the right to assign their interests. They have the right to acquire all property in Richter Park at the price of $2,000 per acre. Unquestionably this is a valuable real right. In Louisiana the owner of a real right in property, as distinguished from the owner himself, is entitled to compensation for the value which is attributable to his right, for his right encumbers the right of full ownership. State v. Ferris, 227 La. 13, 78 So.2d 493, 497 (1955).
On the basis of the development contracts (under which Patout and Richard incurred substantial expenses in planning and developing the subdivision and had vigorously proceeded to develop the subdivision prior to the time the Interstate Highway was planned), Patout and Richard are entitled to recover the fair market value of the properties expropriated, as well as the severance damages suffered by properties owned by Richter but subject to defendants’ development contracts. It was established that the severance damages did not reduce the value of the properties below Richter’s interest of $2,000 per acre.
Lastly, we consider the fair market value of the lands expropriated and the amount of severance damages. The trial court carefully reviewed the lengthy testimony and the well documented, well presented reports prepared by each of the four experts. These experts had carefully studied the complex and complicated problems before forming their respective opinions and each was thoroughly prepared to testify. Their fees were well earned.
The appraisals were made by Maurice Chappuis and Stanley Tiger for the Highway Department and by Dan A. Ritchey, Jr. and Alan J. Angers for the landowners.
In the Patout and Richard case, sixteen separately described tracts of land were taken. In one tract (Parcel 5-18) the Highway Department took 5.216 acres out of an 8.2 acre tract that was not included in the Richter Subdivision. All other tracts were composed of lots which had been platted in the Richter Park Subdivision in 1958, some with offsite improvements, (blacktop streets, water, electricity, and a system for collecting the effluent from septic tanks) others with almost no improvements, and still others with no improvements whatsoever. A summary of the appraisals of Chappuis (for the Department) and Angers (for the landowners) is attached as an appendix to this opinion.
All experts were in virtual agreement as to the fair market value of the developed lots and the value of Parcel 5-18. We affirm the trial courts award of $27,565 for these tracts.
But on the undeveloped property, Chap-puis’ appraisal was about $3,500 per acre while Angers’ appraisal was about $7,900 per acre. The difference between the appraisals is accounted for primarily on one basis. Messrs. Chappuis and Tiger concluded that the property in the undeveloped areas had to be valued as potential subdivision property and therefore valued on an acreage basis. On the other hand, Messrs. Ritchey and Angers valued the properties on a lot basis, and deducted the cost to bring all improvements to the lots. Additionally however, Ritchey and Angers based their evaluation of the lots on the basis that all lots could be sold on the day of the expropriation. This was not warranted, for it is clear that these landowners had *51 substantial other properties available for development which their plan for orderly development would have them first develop. No effort was being made in that direction even at the time of trial. From the evidence we are convinced that a five to ten year delay would be expected for improving these undeveloped lots and placing them on the market. Therefore we find that a reduction in the Angers appraisal (adopted by the trial court) is in order.
We cannot totally accept the approach by the State’s experts. While much of this photographed land (there are more than 25 pictures of the land in the record) was as frequently termed by the Department— “cornfield”—landowners established that they had (1) incurred substantial engineering expense in 1958 planning the entire subdivision; (2) obtained a right of way for drainage and provided drainage for the entire subdivision; (3) followed a plan of opening street by street (until aborted with the unusual purchase in January of 1963 discussed hereinabove).; (4) had provided seven water wells to service the entire subdivision and had planned for installation of a water distribution system to serve the entire subdivision; (5) had provided a similar system to pick up and pump away effluent from septic tanks with provisions to provide this for the entire subdivision; and (6)demonstrated that they could within a reasonable time develop the remainder of the subdivision when they were ready to build houses.
We are impressed by the aerial photographs showing well developed subdivisions nearby and by the fact that these developers were not offering lots for sale to the public. Their method of development was to use their own corporation to build houses on their own lots and market the houses. That this was a successful operation was established by the fact that they had sold almost 100 homes before the western terminal of the 1961 Interstate interchange was located on their property.
The .trial court’s acceptance of the valuation of the property on the lot basis is not manifestly erroneous. State Through Department of Highways v. Mouledous, 200 So.2d 384 (La.App.3d Cir. 1967) and cases cited therein at 390. But we cannot accept the conclusion that all lots could be sold on the date of the expropriation.
Applying these principles, we reduce the award based on Angers appraisal of $63,850 for damages sustained to the undeveloped tracts making up a total of 8.13 acres (6-30, 6-23, 6-31, 5-22, 5-21, and 5-23, including all streets) to the sum of $45,000.
All experts agreed that severance damages were sustained by the remaining properties to the north. The difference is that the State appraisers were instructed not to consider any severance damages as having accrued to the lands owned by Richter. We have ruled that the development contract entitled Patout and Richard to recover severance damages for these properties.
Approximately 100 lots remained north of the Interstate right of way. To get from this area to the city of Lafayette, one would have to drive about a mile north before he could come back to travel another highway to come south to Lafayette. We find no error in the trial court’s award of $27,601 for severance damages suffered by these lots. The award for severance damages to the remaining properties owned by defendants was appraised at $13,360 by Chappuis and at $18,162 by Angers. We find no manifest error in the trial court’s award of the larger sum.
The trial court’s award to Charles A. Pat-out and Lawrence Richard is amended by decreasing the award from $137,178.00 to $118,328.00, subject to credit for the $58,800 deposit. Interest on the balance is awarded at the rate of 5% per annum from judicial demand. Costs incurred at trial are taxed to the State, through the Department of Highways. The expert fees for Messrs. Ritchey and Angers are allowed to the extent of $1,100 to each. Costs of this appeal are taxed to defendants.
Amended and rendered.

*52