249 So.2d 167

**STATE of Louisiana, Through the DEPART-MENT OF HIGHWAYS**

**v.**

**VERMILION DEVELOPMENT COM-PANY, Inc.**

**STATE of Louisiana, Through the DEPART-MENT OF HIGHWAYS**

**v.**

**Charles A. PATOUT et al.**

**Nos. 50615, 50617.**

May 4, 1971.

Rehearing Denied June 28, 1971.

See also 249 So.2d 179.

D. Ross Banister, Chester E. Martin, Johnie E. Branch, Jr., Baton Rouge, for plaintiff-appellant.

Smith & Stansbury, Lafayette, and John M. Sherrill, III, Alexandria, Frank Smith, Jr., Lafayette, for defendants-appellees.

Barranger, Barranger & Jones, William J. Jones, Jr., Covington, Duplantier & McPherson, Adrian G. Duplantier, Farris, Ellis, Cutrone, Gilmore & Lautenschlaeger, Camille A. Cutrone, New Orleans, Benton & Moseley, Edward Donald Moseley, Baton Rouge, Theus, Grisham, Davis & Leigh, Robert Lee Curry, III, Monroe, for amicus curiae.

DIXON, Justice.

The State Department of Highways expropriated various tracts of land belonging to defendants. The defendants are a corporation and the three individuals who owned the stock in the corporation. Two of these individuals operated as a partnership in developing real estate. The third managed the development corporation for the other two. The land involved in the expropriation all lies within newly developed residential subdivision property, or within tracts adjacent to the developed residential subdivision, which adjacent tracts were in various stages of development.

Three suits were filed to expropriate land lying within a proposed extension of Interstate 10 at Lafayette. One was compromised. The other two were consolidated for trial.

The substance of the litigation before us is the compensation to be paid by the State to landowners who acquire land and develop it in an area reasonably believed to lie within the extension of an existing highway right of way which ends nearby. It is the State's contention that the defendants in these cases bought and developed land in "bad faith," knowing that the land was soon to be expropriated and hoping thereby to profit at the expense of the State. The State contends that the defendants are entitled to something less than market value of such property at the time of the expropriation.

The defendants deny any "bad faith" and insist that they are entitled to market value of the property on the date of the expropriation.

The case was tried for ten days. The trial judge stated in his written opinion that the State "has set forth a statement of facts which counsel for defendant has concurred in;" the trial judge then incorporated the agreed statement of facts in his opinion; this portion of the trial judge's opinion was accepted by the Court of Appeal and incorporated in its opinion, 236 So.2d 53. Since these facts are not contradicted before us, we will attach them as as appendix to this opinion.

Vermilion Development Company, Inc. is the defendant in suit numbered 33,209 in the district court. The tracts taken were referred to in the petition as two tracts on which five houses were built. The property was actually five lots in Richter Park

Subdivision, Extension No. 2. $115,350.00 was deposited when the suit was filed on November 18, 1964. On December 15, 1964 the answer was filed; on December 28, 1964 a joint motion of the State and the defendant was presented and signed on the same day by the judge, allowing the defendant to withdraw the deposit.

On April 14, 1965 the State filed an amended petition, in which it alleged:

"4. That after the filing of the original petition herein, plaintiff obtained the information that at the time defendant acquired the land expropriated herein, its officers, Charles A. Patout, Lawrence C. Richard and Eugene W. Patout had full knowledge of the location of the proposed highway right of way and that with full knowledge that the land would be required for the construction of the proposed highway improvement, they constructed within the required right of way five brick veneer one and one-half story houses.

"5. That therefore the just compensation to which the said defendant is entitled is the reimbursement for the land which it purchased within the required right of way and the salvage value of the houses constructed by the defendant upon the land.

"6. That the Department of Highways gave public notice of its plan to construct the highway, for the construction of which defendant's property was expropriated herein, by public hearing on October 9, 1959 and continuously thereafter.

"7. That under the provisions of Louisiana Civil Code, Article 2633, defendant is not entitled to receive more for the property expropriated than its value at the time public notice of the construction of the highway was given, and to pay more would constitute unjust enrichment to defendant at public expense.

"8. That the defendant acquired the land expropriated herein, through its officers, from Albert A. Richter under act of sale dated January 29, 1963, recorded in book Z–38, p. 437, and by act of sale dated February 1, 1963, recorded in book G–39, p. 101, of the conveyance records of the Parish of Lafayette, State of Louisiana.

"9. That the consideration paid to Albert A. Richter by defendant and its officers was at the rate of $2,000.00 per acre, and the amount of land was 1.012 acres, and the total paid for the land was $2,024.00.

"10. That the plaintiff sold the aforesaid five houses at public sale to the highest bidder and received for them the amount of $16,050.00.

"11. That therefore the just compensation to which the defendant is entitled, being the amount paid by the defendant, through its officers, for the expropriated

land, and the amount the houses brought as salvage, is $18,074.00, as is shown by the amended Certificate of Estimate of Just Compensation marked 'Exhibit P–5–A,' annexed hereto and made a part hereof."

The State then prayed for judgment ordering the defendant to refund $97,276.00.

The trial judge concluded that the evidence failed to show that the defendants in the suits knew the exact location of the extension of I–10. He found that the developers had not acted in "bad faith." The district judge said:

"From the communications that have been referred to, it seems that these people did what they could to ascertain its whereabouts so as to protect themselves. Immediately upon being told or warned about the construction, they ceased operations in that respect and moved on into other areas of the subdivision. I do not believe their overall conduct depicts a scheme with the ultimate purpose of enriching themselves at the public expense. Therefore, the first issue presented to the Court in this litigation, i. e. the denial of compensation on the basis of unjust enrichment will be denied. The evidence is not clear and convincing and to a legal certainty that these persons were guilty of bad faith as alleged."

The Court of Appeal was impressed with evidence which indicated that the developers were able to accurately predict in 1961 where I–10 would pass after the expropriation in 1964, and had bought on June 29, 1963 (under a development contract with one Richter which gave the developers the right to acquire additional land adjacent to the development for the price of $2,000.00 an acre) sixty-one lots which either lay within the new right of way or were partially affected by the right of way. The Court of Appeal also pointed out that construction was begun on the new houses lying within the expropriated property in March or April of 1964, and that some work was done on the houses at night and in rainy weather. These houses were two-story houses and more expensive than others in the subdivision.

We are convinced that the interpretation of the testimony by the trial court is more nearly correct than the conclusions drawn by the Court of Appeal. There was no evidence adduced from which we could say that the developers had actual knowledge that I–10 would be extended through their subdivision. The acquisition of lots (later found to be within the right of way) by exercising their rights under the development contract, was a natural and normal extension of a plan of development planned and plotted years before.

The newly acquired lots were adjacent to land already owned by the developers; some of them lay on partially improved streets; all the land acquired at this time was treated by the vendors and vendees as

if it had already been subdivided, and appears on plats in evidence as lots in Richter Park, Extension No. 2. There is evidence in the record that the construction of two-story houses was timely and met an actual demand that existed in the market. The construction of the houses taken in this suit was not the only construction engaged in by the defendant corporation; the managing director of the development corporation, having suffered a heart attack, commenced in 1964 an extensive building program throughout the subdivision, because there was an actual need by the corporation for houses to sell.

The two-story houses were located by the developers in a place apart from smaller houses already constructed, and near lots with large trees. (The sixty-one lots acquired from Richter included a wooded area described by the developers as choice lots).

The evidence reflects that the developers advertised the houses involved aggressively before they were notified by the highway department of the impending expropriation. The houses themselves, having been sold by the State after the expropriation, were moved to other locations, and had been sold to home buyers before the trial. The houses, although larger than others previously constructed in the neighborhood, were not of expensive design and construction.

The Court of Appeal disagreed that a letter received from the highway department in 1961 justified the developers' belief that the highway department intended no further expropriation within the subdivision. The Court of Appeal interpreted the department's letter as being restricted to a statement that the department would not take any other right of way for the "proposed Lafayette Intersection." Suffice it to say that on the maps attached to the petitions for expropriation in these cases, the project is numbered, but is named in prominent lettering "Lafayette-Intersection La 3052 Interstate Highway."

■ Whatever "bad faith" is, we agree with the trial court that it has not been established in this case, and that the response of the developers to the situation created by the department of highways was neither unreasonable, fraudulent nor predatory. The "bad faith" plea of the State is analogous to an allegation of fraud, the burden of proving which lies, of course, "on him who alleges it." C.C. 1848.

The Court of Appeal announces as the rule of law:

"A landowner who buys land or makes improvements within an area he knows will be required for a public improvement is entitled to be compensated for the land at an amount no greater than he paid and to be compensated for the improvement at an amount no greater than the salvage

value of the improvements. State Through Dept. of Highways v. Laird, 219 La. 567, 53 So.2d 674, 676 (1951); 29A C.J.S. Eminent Domain § 175(1), p. 748; Eminent Domain, § 294, 27 Am.Jur.2d 105, 6." State Through Department of Highways v. Patout et al., 236 So.2d 40, 48.

It is difficult to visualize how the rule announced by the Court of Appeal could have applied in Louisiana in an expropriation under the "quick taking" statute. Conceivably, it might apply if it were proved that the landowner, by surreptitious means, penetrated the curtain of secrecy which surrounds decisions made in the State Department of Highways and obtained advance information concerning the final location of a highway improvement. Such a situation could only arise in cases akin to the fraudulent acquisition of information. Such is not the case before us. Such was not the case in State v. Laird, 219 La. 567, 53 So.2d 674. Such was not the case in the encyclopedias cited, nor in the cases cited in the encyclopedias.[1]

1. We do not cite the encyclopedias as authority, but it should be noted that the text referred to at 27 Am.Jur.2d 105 is as follows:

"As a general rule, knowledge of the fact that a public improvement is proposed which will result in the taking of his land does not deprive an owner from recovering the value of buildings subsequently erected, since even though preliminary steps have been taken, the making of the contemplated improvement may be abandoned, and it would be highly unjust to deprive an owner of the right to make in good faith the best use of his property except at his peril. A statute denying compensation for any building erected on land after filing a map of a proposed street across it, although proceedings to open the street or condemn the land have not been begun and perhaps never will be, is unconstitutional as depriving the owner of property without just compensation. Where, however, a building is erected or moved upon land which the owner knows is to be taken by eminent domain, and is placed upon such land in bad faith, with the sole purpose of enhancing the damages and not in the natural, ordinary, and legitimate use of such property, the building remains personal property and should not be considered in determining the value of the real estate. And clearly landowners cannot recover in condemnation proceedings for improvements to the property begun by them after the condemnation proceedings were actually begun."

The text at 29A C.J.S. Eminent Domain § 175(1) p. 748 is as follows:

"While one may in good faith purchase or improve land regardless of any probability of a subsequent appropriation for public purposes, no compensation can be recovered for improvements placed on the land for the sole purpose of enhancing the damages to be recovered on a subsequent condemnation. Generally speaking, a landowner is not entitled to compensation for improvements placed on land after it is appropriated to a public use, but the particular point of time at which the land may be said to be appropriated within this rule varies in the different jurisdictions.

"There is authority for the view that as long as the owner acts in good faith and in an ordinarily prudent manner he should not be deprived of the value of reasonable improvements on his realty even though they were made after the commencement of a condemnation proceeding for the appropriation of such realty. However, under a statute so providing,

State v. Laird was an expropriation suit commenced before the passage of Act 235 of 1948, the first "quick taking" statute. The suit was filed and a jury of freeholders was empaneled. During the pendency of the suit the tract from which a portion was taken by the State was conveyed from Laird to Habert. Habert constructed a garage and a bridge during the pendency of the expropriation proceedings. The Supreme Court denied recovery for these items, saying that the knowledge of the expropriation together with the warning given him by the highway department when he began to construct the new garage "certainly bars recovery for removing and reconstructing the same and for rebuilding his driveway." 53 So.2d 674, 676. The Laird case is clearly inapplicable to the facts before us. No one contends the defendants here improved the land after the taking.

State v. Landry, 219 La. 721, 53 So.2d 908, was decided by the Supreme Court on the same day it decided State v. Laird. In the Landry case, also, there had been an expropriation suit commenced in 1947.

The State delayed the trial, and ultimately dismissed the original suit, filing another proceeding in February of 1949. Squarely before the court was the question of whether the land should be valued at the time the first suit was filed, or at the time of the filing of the second suit. The Supreme Court said at 53 So.2d 910:

"The rule is well settled that the measure of value of property expropriated for public use is the market value of the property at the date of the institution of the expropriation suit. * * * Of necessity, therefore, the value of the land at the time of the filing of the second suit will control."

The expropriation before us was commenced under the authority of R.S. 48:441 et seq. The source of these provisions is Act 107 of 1954. There is no other legislative authority that fits the procedure followed by the State. The measure of compensation set out in Act 107 of 1954 and R. S. 48:453 is as follows:

"The market value is determined as in general expropriation suits but as of the

---

no improvements put upon property subsequent to the service of a summons in an eminent domain proceeding instituted for the purpose of appropriating such property shall be included in the assessment of compensation or damages for the taking. "If an improvement is commenced before the institution of condemnation proceedings, the owner is entitled to compensation therefor, although it is not completed until afterward. Improvements made on

land subsequent to, and in reliance on, a decision of public authorities not to condemn such land may be recovered on its subsequent condemnation.
"Constitutionality of statutes. Particular statutes denying compensation for improvements erected subsequent to a specified point of time have been held unconstitutional, although other statutes have been upheld."

time the estimated compensation was deposited in the registry of the court.

"Damage to the remainder of the property is determined as of the date of the trial.

"In either case the defendant has the burden of proving his claim."

■ The reliance by the department of highways on Civil Code article 2633 [2] is misplaced. Although C.C. 2633 is duplicated in R.S. 19:9, the provisions in R.S. 19:1 et seq. are not followed by the highway department in expropriation cases; R.S. 19:1 et seq. do not provide for appraisal of the property before the filing of the suit, and do not provide for the change of ownership until after appraisal by court appointed appraisers and payment of damages to the owner.

■ Whatever the standard, statutory or jurisprudential, it must comply with the requirements of the Constitution of the State of Louisiana. Article 1 § 2 provides:

"Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and *after just and adequate compensation is paid.*" (Emphasis added).

Article 4 § 15 provides:

"No ex-post facto law, nor any law impairing the obligation of contracts, shall be passed; nor shall vested rights be divested, unless for purposes of public utility, *and for just and adequate compensation previously paid.*" (Emphasis added).

Consequently, the measure of compensation for the taking of the houses is their market value at the time of taking, and not the "salvage value" as found by the Court of Appeal.

■ As for the lots which were conveyed from Richter to the developers of the subdivision, the State's contention is that it should pay only what the developers paid (at the rate of $2,000.00 per acre) instead of the market value of the lots at the time of the expropriation. Why the State should be allowed to profit from the contractual arrangements of the developers has not been demonstrated. The market value of the lots would, it seems, be the same, whether they were owned by Richter or any combination of the defendants. Their market value was not increased by their purchase by the developers. It would be grossly unfair to restrict the recovery for this land to the price fixed in a development contract made many years before, when

2. "In estimating the value of the property to be expropriated, the basis of assessment shall be the value which the property possessed before the contemplated improvement was proposed, without deducting therefrom any amount for the benefit derived by the owner from the contemplated improvement or work."

the value of the land had increased due to the passage of time and the industry of the developers.

■ In addition to the disagreements arising from the purchase of lots lying within the proposed right of way, and the construction of five houses commenced just prior to the expropriation, the State complains of an award to the developers for severance damages to land owned by Richter. In 1958 there were contracts executed between Charles A. Patout and Lawrence C. Richard, as "agents," and Albert A. Richter and Robert H. Richter. In these two contracts, Patout and Richard obligated themselves to develop the Richter land into subdivision property. The Richters obligated themselves to furnish land as needed by the developers. The developers incurred specific obligations in a development program, including keeping the street development "sufficiently ahead of development at least to the extent of 20 building lots." The price to be paid the Richters for the lots was fixed in the agreement at $2,000.00 per acre. The development of the subdivision was to be entirely under the control of and at the expense of Patout and Richard. Their interests and obligations under the contracts purported to be assignable and heritable.

The contracts provided that they would remain in full force "until all of said lots are sold," and would terminate automatically "when the last lot is sold."

Because the new highway separated Richter land, (as yet undeveloped, but included in the contract between the Richters and Patout and Richard) the developers claimed damages in their reconventional demand. Both the trial court and the Court of Appeal awarded the developers damages.

Some of the land expropriated was owned by Patout and Richard and was adjacent to the Richter land. These owners are not only entitled to recover fair and just compensation for the land taken; if their rights under the contract with the Richters constitute "property," Article 1 § 2 of the Constitution requires that the developers be compensated, for "private property shall not be taken or damaged except * * * after just and adequate compensation is paid."

The State does not even argue that the rights of the developers under the contract with Richter did not constitute property. (See Mongogna v. O'Dwyer, 204 La. 1030, 16 So.2d 829). The evidence, as found by the trial court, clearly showed that the developers' rights under their contract suffered a serious diminution in value as a result of the taking. The analysis of the trial court, as affirmed by the Court of Appeal, was correct.

■ The State complains of an award for damages to a house under construction at the time of taking, but not expropriated.

The house and lot lie north of the right of way taken, and were to have been isolated, unuseable and unsaleable, until the construction of an access road. The trial court accepted defendant's evidence and allowed $3,591.00 to the defendant. We find no error in this award, in which the Court of Appeal concurred.

In the district court the testimony of the two appraisers for the State and the two appraisers for the defendants was carefully analyzed. Various approaches to evaluating the newly constructed houses were explained by the appraisers. Defendant, engaged in building numerous houses, was unable to produce accurate records establishing the cost of each. The trial judge accepted the testimony of one of the State's appraisers, and fixed the value of the five houses and lots taken at a total of $124,550.-00, with which conclusion we agree.

For the reasons expressed, the judgment of the Court of Appeal is reversed in part and set aside. There is now judgment reinstating the judgment of the trial court as follows:

It is ordered, adjudged and decreed that there be judgment herein in favor of defendant, Vermilion Development Company, Inc., and against the plaintiff, the State of Louisiana, through the Department of Highways, in the amount of $128,141.00, subject to a credit of $115,350.00, heretofore deposited into the registry of the court by the plaintiff and withdrawn by the defendant by order of court, with legal interest thereon from date of judicial demand until paid, and all costs.

TATE, J., recused, having participated in Court of Appeal decision.

### Appendix

"The State of Louisiana, through the Department of Highways, under the authority conferred by Section 19.1 of Article VI of the Constitution of Louisiana, LSA, and the provisions of LSA-R.S. 48:441–460, filed suit for the purpose of expropriating property of defendants for highway purposes in the above captioned matters.

"The above suits were consolidated for trial and came on for hearing on the 21st day of June, 1965.

"It was stipulated by and between counsel that a public notice of a public hearing to be held in Lafayette, Louisiana was published in The Advertiser, a Lafayette newspaper, on September 10, 1959; further that the public hearing regarding the contemplated construction of I-10 through the Lafayette area was held in Lafayette, Louisiana on October 6, 1959.

"It was further stipulated that the salvage value of the 5 houses expropriated from Vermilion Development Company, Inc. was $17,760.00.

"The property owned by defendants and involved in this case is located partly in

the Richter Park Subdivision of Lafayette Parish, Louisiana, and partly in property located adjacent thereto and included in a proposed future extension of such subdivision. The property involved in Suit No. 33,209 is improved and the property involved in Suit No. 33,201 is unimproved. Plats of survey showing the properties involved in the taking are attached to both suits as Exhibit P-3.

"Originally, A. A. Richter and Robert H. Richter owned a rectangular shaped tract of land containing 108.82 acres. They had a partition of this property with A. A. Richter taking the north one-half thereof and Robert H. Richter taking the south one-half. Shortly thereafter, and on the same day, September 16, 1958, both Richters entered into separate but similar development contracts with Charles Patout and Lawrence Richard under the terms of which they obligated themselves to sell their land to such developers at the rate of $2,000.00 per acre in exchange for the development of such land into a residential subdivision.

"Contemporaneously with the above transaction, Richard, Charles Patout and his brother, Eugene Patout, created the Vermilion Development Company, Inc., which corporation was owned by the three men in the proportions of one-third to each. The corporation was to purchase property from the developers as lots and build homes on them which it was to sell to the general public.

"The original plan was to develop the property covered by the development contracts in a prudent, orderly, and efficient manner. The first subdivision created on December 3, 1958 was called Richter Park Subdivision and consisted of a street running north and south called Richter Drive with building plots on either side having dimensions of approximately 60 feet fronting on said street by a depth of approximately 105 feet. Approximately in the center of Richter Drive was Julie Drive, which began on the west line of Richter Drive and extended westwards. Richter Drive above and below Julie Drive was called North and South Richter, respectively. The plan operated as expected and in due time the lots in the subdivision were sold to the corporation who constructed homes on such lots and sold them to the general public.

"In time, the need for additional lots arose and on September 11, 1959, Richter Park Subdivision, Extension No. 1 was created. Julie Drive was extended further westwards, and North and South Orleans Drive was created with lots on either side thereof similar in size and plan to that employed in the original Richter Park Subdivision. There was also created at this time, Covington Drive and Hammond Road at the north and south ends thereof respectively.

"The same need for additional lots prompted the creation of Richter Park Subdivision, Extension No. 2 on February 22,

1962, with Julie Drive, Covington Drive and Hammond Road being extended still further westward and the creation of North and South May Drive as the main street of this extension. Lots size and shape were similar to the two preceding subdivisions.

"Subsequent thereto Albert A. Richter and Robert Richter sold to Charles A. Patout and Lawrence C. Richard all of the property owned by them and located south of the proposed extension of West Julie Drive up to the railroad right-of-way so that at the time of the taking said purchasers owned all of the property located south of West Julie Drive.

"During this period of time, Louisiana Highway No. 3052 (US 167) was created, being located just to the east of the Richter Park Subdivision complex. The interchange or intersection of this highway with the proposed Interstate Highway 10 was so located that the westerly leg thereof, having a right-of-way 300 feet in width, extended into the Richter Park Subdivision to a point located midway between North May and North Orleans Drive or on a line running north and south and located on the rear or back lot lines of lots facing North Orleans Drive and North May Drive.

"Properties owned by defendants herein and affected by such intersection was acquired from them by plaintiff by voluntary sales, copies of which are on file in these proceedings.

"On January 29, 1963, Charles A. Patout and Lawrence C. Richard purchased from A. A. Richter, 61 lots, 6 of which were located in the Richter Park Subdivision, Extension No. 2, and 55 of which were located in the undedicated and unimproved portion of the Richter tract scheduled for eventual development as a residential subdivision. All of these lots, without any exception whatsoever, were located completely within or were partially affected by the right-of-way of Interstate 10.

"Counsel for the Department argues that the defendants acquired knowledge of the location of the right of way prior to the taking, and in anticipation of that taking acquired from the owner just that property located within the right-of-way and, therefore, were unjustly enriched at the public expense. Bad faith is contended in its effort to deny to defendants the compensation they seek, or the amount first deposited when this suit was filed.

"It is argued that the interchange or intersection of U. S. I-10 with La. State Highway 3052 (US 167) was located just east of the Richter Park Subdivision so the defendants realized that the price then being paid to landowners was good and they set about making plans to get as much money as they could when the State came to buy property for the Interstate continuation westward over and across this property. It is said in brief that defendants' maneuver was to gain the sympathy of this

Court. Counsel argues further that a strip map of I-10 was supplied by the Department and was interlaid over a plat of the Subdivision enabling defendants to determine exactly where the highway would run. This was prior to 1964. Further, the Department asserts that the center line of the highway was established in March of 1959 by the placing of stakes which could be clearly seen by all viewers.

"The defendants asked the Department if it needed any further right-of-way as of August 5, 1961, but Counsel contends that this was 'to complete the position of innocence of themselves' and that the reply by the Department which read in part as follows: 'We do not contemplate the acquisition of any further right of way in your subdivision, for the proposed Lafayette Intersection,' made it clear that the intent was of the intersection only.

"Counsel then attacks the purchase by Patout and Richter of the 61 lots in 1963 as being an integral part of the scheme to unjustly enrich themselves at the public expense. They then knew, the Department says, that the highway was to occupy this identical area. The construction of the residential houses on 5 of these lots of a value above those in the general area is another indication of bad faith, suggests the Department. The construction of these houses commenced in March, 1964.

"The testimony of Albert A. Richter is referred to in support of the State's posi-

tion and he is quoted to say that Mr. Patout told him he wanted to buy the lots to make money on the Highway Department. This Mr. Richter, it is noted, is the same Albert Richter who settled his case with the Department and then attempted to intervene in these suits, making substantially the same contentions as the Department.

"Defendants argue that they were guilty of none of the accusations made by the Department of Highways. They insist that they were acting in the normal and customary course of development in subdividing property for resale. They were, in fact, experienced men in the real estate business and had developed other subdivisions before. It is vehemently denied by Mr. Patout and all others concerned that they knew where the highway was to pass and schemed to unjustly enrich themselves by virtue of this knowledge.

"Counsel for defendants argues that the Department knew just where the highway was to be but took no affirmative steps to prevent the defendants from developing the land adversely to their interest. Mr. Louis Smith, employee of the Department of Highways, stated that he ran the center line of I-10 through the subdivision area and placed stakes every 100 feet some time in March of 1959 but permanent markers were only placed in the center of the railroad track to the west. He further stated that unless a person had access to field survey notes it would be difficult to lo-

cate these permanent markers. Neither the defendants nor their engineers had access to this information.

"Mr. Frank Chachere, surveyor for the Highway Department, said that he saw about 2 blocks of the subdivision developed in 1959. He states that he sent this information to the Department.

"Mr. Henry McBride, a right-of-way agent for the Department, stated that if construction is going on on the right-of-way it is usual to ask the owner to stop.

"Mr. Robert Bethea, Assistant Right-of-Way Agent for the Department, states that the vicinity maps available in 1959 did not show the exact location of the proposed rights-of-way. He went on to explain that where construction is going on in an area contemplated to be taken that they attempt to notify the owners not to incur additional expense. There can be some purchasing before the project is approved but only in cases of protective buying where construction is known to exist or to be commenced or in hardship cases to protect the individual.

"Mr. L. J. Lejeune, Review Appraiser for the Department, acknowledged that he had received a letter from Mr. Eugene Patout, President of Vermilion Development Company, requesting knowledge of the location of the right of way, and he had replied to the same. These letters are significant and are copied here in full.

" 'August 5th, 1961

Mr. Lejeune

Louisiana Department of Hy.

Land Appraisal Department

Baton Rouge, Louisiana

" 'RE: Richter Park Subdivision and
     Richter Park Ex. #2
     Lafayette, Louisiana

" 'Dear Sir:

" 'Due to contractual commitments on the above captioned subdivision(s), and work now being done not only by our corporation, but by the developers, Patout-Richard Agency, the time has come where it is imperative that we begin negotiations on any other right of ways that the state and/or state-federal projects might intersect the above captioned property.

" 'We will suffer grave damages in our development of the property unless we can effect sale to you on any other property which you might need for your projects.

" 'Relocation of water lines, sewer lines, etc., on our part, and the possible relocation of streets (now being paved) as well as existing drainage and engineering could cause us irreparable harm.

" 'We have been advised by our attorneys to notify you immediately of the situation as it exists today, and to request that you submit for an amicable settlement for future ROWs as a necessary expedient so that damages to us will be minimized.

" 'Please acknowledge this letter by early mail, as it is impossible for us to stop our

operations upon the ASSUMPTION that Interstate No. 10 MIGHT intersect our development.

" 'Yours very truly,

VERMILION DEVELOPMENT CO. INC.

BY: /s/ EUGENE W. PATOUT
        Eugene W. Patout, President

EWP/c' "

" 'August 17, 1961

F. A. P. I–10–2(12)101
STATE PROJECT 450–05–03
LAFAYETTE INTERSECTION
LA. 3052 INTERSTATE HWY.
LAFAYETTE PARISH

---

" 'Mr. Eugene W. Patout
President
Vermilion Development Co., Inc.'
122 N. Richter Drive
Lafayette, Louisiana

" 'RE: RICHTER PARK SUBDIVISION
    & RICHTER PARK EX. #2
      LAFAYETTE, LOUISIANA

" 'Dear Mr. Patout:

" 'In reply to your letter—of August 5, 1961—and also our telephone conversation this date, please be advised that I have discussed this matter with our Engineering Department and we do not contemplate the acquisition of any further right of way in your subdivision, for the proposed Lafayette Intersection. As far as can be deter-mined, our Construction Plans are complete and we have—as of this date—acquired all right of way necessary for the construction of this project.

" 'If we can be of any further assistance to you, please feel free to call upon us.

" 'Yours very truly,

/s/ L. J. LEJEUNE
      L. J. LEJEUNE
      REVIEW APPRAISER

LJL/mep' "

"Having heard nothing from the Department subsequent to this communication, 5 homes on the 2 tracts involved in Suit No. 33,201 were begun in March and April of 1964. Mr. Patout stated that they were constructed because he felt the market was such that this type home could be sold. In July of 1964 he was told by Mr. Maurice Chappuis, one of the appraisers for the Department, that the highway was to come through Richter Park. At this time the fifth home on these five lots was possibly 95% completed. Mr. Chappuis advised him that someone from the Highway Department would contact him and Mr. McBride later on did contact him. He thereupon discontinued all construction in the subdivision, and within the limits which he then understood the highway would encompass. After he received the July 24, 1964 letter from Mr. Cope, he states that he discontinued operations but immediately started new construction in a different area of the sub-

division. These houses were in the price range of $20,000.00 and upward.

"The July 24 letter referred to above reads as follows:

" 'July 24, 1964

STATE PROJECT NO. 450–04–03
F. A. P. NO. I–10–2(12) 101
LAFAYETTE – INTERSECTION – La.
3052 Highway
ROUTE I–10
LAFAYETTE PARISH

" 'Vermilion Development Company, Inc.
100 North Richter Drive
Lafayette, Louisiana

" 'ATTENTION: Mr. Eugene W. Patout, President

" 'Dear Mr. Patout:

" 'As you have previously been advised by Mr. Henry H. McBride of our Lafayette District Office, the Department is contemplating the acquisition of property for the above captioned project in the near future. This project will involve the construction of a portion of Route I–10 through Richter Park Subdivision within the confines of your ownership.

" 'We are not concluding our survey of the area required from your ownership. Survey crews on the ground are taking topograph and this, when plotted, will complete the property map of Richter Park. We also have professional Real Estate Appraisers in the area developing the neces-

sary data to finalize an appraisal of the area required from you.

" 'It is anticipated that all data will be processed in sufficient time to permit us to begin formal negotiations about August 1, 1964. This, of course, is a tentative date assuming development of no unusual difficulties.

" 'Inasmuch as the development of a complete survey map and appraisals of a highly developed area such as Richter Park is a very complex operation, we request that you delay construction of additional improvements within the required area until negotiations for the required area can be concluded. We will, of course, expedite our acquisition process as much as possible in this instance.

" 'Your cooperation in this matter will be greatly appreciated. Should you desire any additional information in connection with this project, please do not hesitate to call on us.

" 'Yours very truly,

" '/s/ GENE N. COPE
GENE N. COPE
SENIOR RIGHT OF WAY
AGENT

GNC:sbz' "

ON APPLICATION FOR REHEARING

PER CURIAM.

■ The meaning of "legal interest" is questioned. The interest rate as provided

in both R.S. 48:455 and La.Civil Code Article 1938 was 5% when these debts accrued (C.C. art. 1938 was amended in 1970). We do not decide which of these provisions now prevails for it is not at issue. Legal interest on this judgment is 5%.

TATE, J., recused.