625 So.2d 1070 (1993)
The BOARD OF COMMISSIONERS OF the NEW ORLEANS EXHIBITION HALL AUTHORITY
v.
MISSOURI PACIFIC RAILROAD COMPANY, et al.
No. 93-CA-0755.
Court of Appeal of Louisiana, Fourth Circuit.
September 22, 1993.
Writ Granted September 27, 1993.
Stay Order Recalled; Writ Denied October 15, 1993.
Order Granting Rehearing to Clarify Prior Order November 18, 1993.
*1072 Adams and Reese, Sam A. LeBlanc, III, Phillip A. Franco, Todd R. Thomas, Jeffrey W. Bennett, Berrigan, Litchfield, Olsen, Schonekas & Mann, Joseph E. Berrigan, Jr., New Orleans, for plaintiff-appellant New Orleans Exhibition Hall Authority.
Deutsch, Kerrigan & Stiles, Robert E. Kerrigan, Jr., Darrell K. Cherry, Joseph L. Spilman, III, Gerald P. Weller, Allan Kanner & Associates, Allan Kanner, Dorothea M. Suthon, New Orleans, for defendant-appellee New Orleans 2000 Partnership.
Before KLEES, ARMSTRONG and WALTZER, JJ.
KLEES, Judge.
This is an expropriation suit filed by the Board of Commissioners of the New Orleans Exhibition Hall Authority ("NOEHA") against Missouri Pacific Railroad Company and Upland Industries Corporation (collectively referred to as "MOPAC") and New Orleans 2000 Partnership ("N.O. 2000") to acquire a 22.85 acre tract of land located immediately adjacent to Phase II of the New Orleans Convention Center on the Mississippi River.
NOEHA, a political subdivision of the State of Louisiana, was organized to plan, build and operate the New Orleans Convention Center. NOEHA's functions are implemented through its Board of Commissioners ("The Board"). Construction of Phase I of the NOCC began in 1985 and due to its success, construction on Phase II was begun *1073 shortly thereafter. Phases I and II of the NOCC are located on the Mississippi River and span from Julia Street upriver to Callipoe Street. Because of the apparent need for a larger exhibition facility, the Board began to plan the Phase III expansion in 1988. Pursuant to this plan, the Board and the City of New Orleans began negotiations with MOPAC to purchase part of a 72 acre tract of land located upriver from the NOCC. Negotiations with MOPAC reached a virtual impasse because MOPAC wanted to sell the entire 72 acre tract while NOEHA was only interested in purchasing the 22.85 acres necessary for the expansion.
In 1991, while NOEHA was still attempting to buy the property, Mr. Joe Canizaro of N.O. 2000 began negotiations with MOPAC to purchase the entire 72 acres. Their negotiations resulted in a buy-sell agreement signed on July 11, 1991 giving N.O. 2000 the right to buy the entire tract for $11,000,000. Before N.O. 2000 and MOPAC closed the sale, NOEHA made a final offer on September 6, 1991 to buy 22.85 acres of the land for $5,500,000, which was not accepted. On September 10, 1991, NOEHA filed the present action for expropriation pursuant to La.Rev. Stat. 19:2 et seq.
On September 11, 1991, the day after filing, MOPAC sold the entire 72 acre tract to N.O. 2000 for $11,000,000. Thereafter, NOEHA amended its petition adding N.O. 2000 as a party defendant. At trial, NOEHA maintained that it needs the 22.85 acres for the Phase III expansion of the NOCC and to provide an area for truck marshalling activities associated with the NOCC. N.O. 2000 argued that NOEHA failed to show a public need and purpose for the taking. Judgment expropriating the 22.85 acres requested by NOEHA was entered on July 8, 1992, wherein the trial court found that NOEHA had met all statutory prerequisites to its expropriation suit and additionally had met its burden of proving that the property was for a public necessity. In December of 1992, a trial was held to determine compensation, and the jury awarded $13,000,000 to N.O. 2000.
NOEHA appealed and pleads a reduction of the $13,000,000 award. N.O. 2000 answered and filed a cross-appeal seeking reversal of the judgment of expropriation and, in the alternative, a judgment increasing its compensation award. We will discuss the expropriation and compensation trials separately.
I. Expropriation
The issue before the court was whether NOEHA, as the expropriating authority, had met its burden of establishing a public necessity and public purpose for the taking. Louisiana law establishes that the state or its political subdivisions may expropriate needed property where the state and owner cannot agree upon a price. La.R.S. 19:2(1). However, this right is limited by the Louisiana constitution which provides that "... property shall not be taken or damaged by the state or its subdivisions except for public purpose and with just compensation paid to the owner or unto the court for his benefit." La.Const. Art. I, Sec. 4 (1974).
In the instant case, the expediency of the expropriation is a matter for judicial determination; however, the suitability of the property sought to be expropriated for the purpose is primarily a question of fact on which the judgment of the trial court will not be disturbed unless manifestly erroneous. See City of Westwego v. Marrero Land & Imp. Association, 221 La. 564, 59 So.2d 885 (1952). In our review of the trial court's judgment of expropriation, we first consider the alleged errors of law raised by N.O. 2000 in its appeal.
N.O. 2000 contends that the trial court erred in: (1) failing to dismiss NOEHA's suit on the grounds that NOEHA had failed to comply with the mandatory statutory prerequisites to expropriation imposed by La.R.S. 19:2 et seq.; and (2) concluding, contrary to the weight of the evidence and applicable law, that NOEHA had established a public need for the entire 22.85 acre tract at this particular site.
A. Statutory Prerequisites to Expropriation
N.O. 2000 argues that the following procedural and statutory defects render NOEHA's *1074 expropriation suit void: (1) NOEHA failed to conduct bona fide negotiations prior to filing suit; (2) NOEHA misstated the method of appraisal used to value the property; (3) NOEHA's appraisals were not completed timely; (4) NOEHA's president did not have the requisite Board approval to file suit; and, (5) NOEHA failed to make an unconditional offer to purchase the property at issue.
NOEHA refutes these allegations by establishing its compliance with each of the statutory requirements prior to filing the petition for expropriation. La.R.S. 19:2.2 provides that before exercising its rights of expropriation, the state or its political subdivisions must provide the owner with certain information from its appraisal as to the amount of compensation due. The required information includes the name, address, and qualifications of the appraisers, the amount of the appraisals, and a description of the methodology used in the appraisal. Additionally, the state must offer to compensate the owner in an amount equal to at least the lowest appraisal.
The record clearly supports NOEHA's position that it complied with the legal prerequisites to filing a petition for expropriation. The record shows that negotiations between MOPAC and NOEHA, although unsuccessful, were ongoing, and NOEHA had sufficient funding to conduct these negotiations in good faith. Additionally, NOEHA's offer to purchase the necessary portion of the 72 acres was based upon valid appraisals, and finally, the record indicates that NOEHA's Board had authorized its president to take the necessary actions to acquire the site in two separate resolutions. Accordingly, we find that the trial court properly maintained NOEHA's suit.
B. Public need for Expansion of the Exhibition Facility and for Truck Marshalling
N.O. 2000 argues that the trial court erred in determining that there was a public need for the expansion of the convention center on a 12 acre upriver site or, in the alternative, in determining a public need for more than 8 acres for the expansion. N.O. 2000 also argues that the trial court erred in allowing 10 acres for truck marshalling. At issue is whether expropriation of the MOPAC property is necessary.
In order to expropriate property, an expropriating authority must prove necessity for the expropriation. City of Westwego v. Marrero Land & Improvement Assoc., 59 So.2d 885 (La.1952); Parish of Jefferson v. Marsh Investment Corp., 398 So.2d 27 (La. App. 4th Cir.), writ denied, 401 So.2d 994 (La.1981). Once public necessity is established, the extent and the location of property to be expropriated are within the sound discretion of the expropriation authority, and the determination of same will not be disturbed by the courts if made in good faith. Parish of Iberia v. Cook, 238 La. 697, 116 So.2d 491 (1959); Parish of Jefferson v. Marsh Investment Corp., supra, at 27. We first address the necessity of taking 12 acres for expanding the exhibition facility, and then address the necessity of taking 10 acres for truck marshalling.
1. Exhibition Facility Expansion
NOEHA established that in order to fulfill its public purpose of promoting economic growth and development of the area, it is necessary to further expand the convention center. This determination was based upon numerous studies done in relation to the Phase III expansion. The information gathered included the expert opinion of Mr. Edward McNeill, Executive Vice President of the Greater New Orleans Tourist and Convention Commission, the economic reports of Dr. Ryan, a University of New Orleans economist, the plans and information from the architectural firms of Billes/Manning and Perez/Ernst, and the studies performed by Coopers and Lybrand.
Since 1986, Dr. Ryan has performed annual economic impact studies of the convention center, which demonstrate the consistent beneficial impact of the convention center by creating new jobs and aiding the economy.
Mr. McNeill, an expert in convention and trade show marketing, evaluated the need for the expansion and opined that the expansion, which should enlarge the convention center *1075 to an excess of 1,000,000 square feet in exhibition space was necessary to promote economic growth. Mr. McNeill based his opinion upon his calculation that there would be a negative economic impact of $155,637,693 in losses if Phase III was not built. (This figure was based upon the loss of 30 conventions already scheduled for Phase III and only includes lost delegate spending, not exhibitor and secondary spending.) Mr. McNeill's conclusions and findings are further supported by the Coopers & Lybrand reports which recommend that NOEHA's option was to construct the Phase III expansion upriver on the MOPAC property.
Once NOEHA had established that expansion was necessary, the Board employed the architectural firms of Billes/Manning and Perez/Ernst to submit plans for the expansion. The Board selected a linear configuration extending upriver directly under the Greater New Orleans Bridge on the MOPAC property. This configuration was selected because it would be consistent with Phase I and Phase II and it would allow an expansion of over 1,000,000 square feet.
In response, N.O. 2000 claims that an upriver expansion of over 1,000,000 square feet is unwarranted and that a smaller site would sufficiently fulfill NOEHA's needs. N.O. 2000 asserts that no more than 8 acres of its property should be expropriated for the expansion or alternatively, NOEHA should expand downriver on the International River Center parking lot located in front of the Riverwalk.
The record supports the trial court's determination that there is a public need and purpose for the Phase III expansion. Once the necessity is determined, the extent of the property to be expropriated and the location falls within the sound discretion of NOEHA, and the determination of same will not be interfered with by the courts if made in good faith. Parish of Iberia v. Cook, 116 So.2d at 493. We find no evidence of bad faith in the instant case.
2. Truck Marshalling
N.O. 2000 asserts two general arguments in opposition to the expropriation of 10.85 acres for truck marshalling: (1) an alternative location should be selected for truck marshalling, and; (2) NOEHA no longer needs the full 10.85 acres because NOEHA acquired the right to use 6.2 acres for truck marshalling in the interim between the filing of its petition and the judgment of expropriation.[1]
At trial NOEHA presented the testimony of Dr. Trail, President of NOEHA, and Mr. Fore, Executive Vice-President of NOEHA, that truck marshalling at the expansion site is an integral part of the convention center's operations. The record shows that the Phase III expansion will encompass the area where truck marshalling was conducted in the past. Since this area will no longer be available and the expansion will require an even larger area for truck marshalling, NOEHA argues that the 10.85 acres are warranted.
We agree with the trial court's findings that 10.85 acres are necessary for the convention center's needs, and that truck marshalling is an integral part of the convention center expansion. Although N.O. 2000's suggestion that another location would be equally effective may have merit, the law is that the extent of the property to be expropriated, and the location thereof, are within the sound discretion of NOEHA. In the absence of any evidence of bad faith on the part of NOEHA, we will not disturb the trial court's determination.
II. Compensation
The sole issue before the jury was the amount of compensation due N.O. 2000 for the 22.85 acre tract expropriated. Louisiana law requires that the property owner receive "just compensation". La.R.S. 19:2.1. Both the statutory law and the state constitution provide that the owner whose property is expropriated must be compensated "to the full extent of his loss." La.R.S. 19:9; La. Const. Art. I, § 4 (1974).
*1076 In the instant case, the jury's factual determination that the appropriate compensation is $13,000,000 may not be disturbed on appeal absent a finding of manifest error. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). Prior to reviewing the ultimate verdict under the manifest error standard, however, we consider the various errors of law which each side contends were made by the trial judge in relation to the jury trial.
NOEHA contends that the trial judge erred in: (1) failing to instruct the jury that an owner who has purchased his property with knowledge of its pending expropriation is entitled to recover in compensation no more than he paid for the property; (2) ruling before trial that the date of valuation of the property for compensation purposes is the date of trial rather than the date the expropriation suit was filed; (3) failing to exclude as speculative certain testimony of N.O. 2000's experts regarding the "highest and best use" of the property, and giving erroneous jury instructions on the concept of "highest and best use"; and (4) failing to allow NOEHA to present sufficient rebuttal evidence as to the value of the property on the date of trial. In addition to refuting these arguments by NOEHA, N.O. 2000 contends that the trial judge erred in: (1) failing to grant N.O. 2000 a judgment n.o.v. on the basis that NOEHA introduced no competent evidence concerning the value of the property on the trial date; and (2) failing to award attorney's fees. We address these each issue in turn.
A. Purchasing Land with Knowledge of Pending Expropriation
NOEHA strongly urges that the trial judge erred in failing to instruct the jury that one who buys property which he knows will be expropriated cannot, as a matter of law, receive anymore in compensation than what he paid for the land. In the instant case, there is no question that the N.O. 2000 partners knew when they purchased the 72 acre tract for $11,000,000 that NOEHA wanted part of the land for the expansion of the convention center; in fact, the sale to N.O. 2000 was not finalized until the day after the expropriation suit was filed. At issue is whether this knowledge should bar N.O. 2000 from receiving compensation in an amount greater than whatever proportion of the eleven million dollar purchase price is attributable to the 22.85 acres expropriated.
NOEHA's argument is based upon State, Through Dept. of Highways v. Vermilion, 258 La. 1159, 249 So.2d 167 (1971), wherein the Louisiana Supreme Court reviewed an expropriation proceeding under the "quick-taking" statute[2] (as opposed to a regular expropriation governed by R.S. 19:1 et seq., as in the instant case). In Vermilion, the state claimed that a landowner/developer who had built (and then sold) five houses on his property after he knew it would probably be expropriated for the extension of Interstate 10 was not entitled to be compensated for these improvements at any more than their salvage value. The trial court awarded the fair market value of the houses, and the court of appeal reversed, awarding only the salvage value because of the landowner's "bad faith." The Supreme Court found that the state had failed to prove bad faith on the part of the landowner, and reversed the court of appeal. The following dicta from Vermilion is relied upon by NOEHA as establishing a rule of law:
The Court of Appeal announces as the rule of law:
"A landowner who buys land or makes improvements within an area he knows will be required for a public improvement is entitled to be compensated for the land at an amount no greater than he paid and to be compensated for the improvement at an amount no greater than the salvage value of the improvements. State Through Dept. of Highways v. Laird, 219 La. 567, 53 So.2d 674, 676 (1951); 29A C.J.S. Eminent Domain § 294, 27 Am.Jur.2d 105, 6." State Through Department of Highways v. Patout et al., 236 So.2d 40, 48 (1970).

*1077 It is difficult to visualize how the rule announced by the Court of Appeal could have applied in Louisiana in an expropriation under the "quick taking" statute. Conceivably, it might apply if it were proved that the landowner, by surreptitious means, penetrated the curtain of secrecy which surrounds decisions made in the State Department of Highways and obtained advance information concerning the final location of a highway improvement. Such a situation could only arise in cases akin to the fraudulent acquisition of information. Such is not the case before us.
249 So.2d at 171. The Vermilion Court goes on to distinguish the Laird case and the encyclopedia article cited by the court of appeal as not being representative of the principle of law announced by the appellate court.[3] The Court specifically leaves unanswered the question of whether such a principle might apply in a regular expropriation procedure under R.S. 19:1 et seq., wherein the change of ownership does not occur until after a trial is held and the expropriating authority pays compensation to the landowner. Id. at 172. The Vermilion Court concludes by noting that "[w]hatever the standard,... it must comply with the requirements of the [state] Constitution....", which at the time provided for "just and adequate compensation" to be paid to the property owner.[4]Id. at 173.
We have found no case in Louisiana, either before or since Vermilion, in which the court has faced the issue of whether a landowner who buys property knowing it will be required for a public purpose is thereby barred from receiving at the time of the expropriation more than he originally paid for the property. With one exception, all the cases cited to us deal with compensation for improvements that were placed upon the property after the owner found out about its pending expropriation. In State v. Laird, 219 La. 567, 53 So.2d 674 (1951), the case distinguished by the Vermilion Court, the landowner was denied compensation for a new garage he built after he had been notified of the institution of expropriation proceedings on his property. Id. at 676. In Dixie Electric Membership Corp. v. Sibley, 280 So.2d 311 (La.App. 1st Cir.1973), the court denied a landowner compensation for the removal of a house which he had deliberately moved onto his property after he was informed that expropriation would occur. The court interpreted the landowner's positioning of the house, which was located "directly within the pathway of the [proposed] transmission line" instead of "advantageously near the road", as being evidence of the landowner's bad faith. Id. at 314. Finally, in Orleans Parish School Board v. Montegut, 255 So.2d 613 (La.App. 4th Cir.1971), this court affirmed the trial court's ruling awarding a landowner additional compensation for the costs of an apartment building he had begun constructing on his property five months before it was expropriated. The expropriating authority had argued that the landowner's knowledge of the potential expropriation should have kept him from starting the apartment building. We rejected this argument, stating:
Preliminarily plaintiff argues that since defendant knew plaintiff was considering expropriating either the square involved or an adjacent one, defendant should not have incurred most of the expenses involved. The error in this view is that it would expropriate property without compensation, pending a determination of whether or not to expropriate. As long as the owner's actions in the face of possible expropriation are "neither unreasonable, fraudulent nor predatory" his improvements are compensable: State through Dept. of Hwys v. Vermilion Develop. Co., 258 La. 1159, 249 So.2d 167 (1971).

Id. at 615 (emphasis added).
The most recent case to consider the affect of the landowner's knowledge on his compensation *1078 rights is Hospital Service District No. 1 v. Guillot, 482 So.2d 765 (La.App. 5th Cir.1986), in which the court denied compensation to a party, not the landowner, who had executed options to purchase certain property knowing that the property would probably be expropriated for a hospital. Under the facts presented, the court found that the option-holder was in bad faith because he "knew of the coming expropriation and his options were apparent attempts at setting artificially high prices." Id. at 771.
Taken as a whole, we do not find that the Vermilion case and the ensuing jurisprudence establish any rule of law with regard to the compensation owed a landowner who buys property with knowledge of its pending expropriation. We have found no case in Louisiana which directly confronts this issue. Although there is a line of cases denying compensation for improvements built in "bad faith", the term "bad faith" is not clearly defined. However, certain cases, such as our decision in Orleans Parish School Board v. Montegut, and the Supreme Court's decision in Vermilion, make it clear that "bad faith" must be more than mere knowledge of a pending expropriation. In the instant case, although the final sale to N.O. 2000 did not occur until after the expropriation suit was filed, the purchase agreement had been signed three months before. Moreover, while the evidence shows that Mr. Cannizaro intended to make money on his purchase, it shows nothing akin to fraudulent or predatory behavior on his part. Under these circumstances, the trial judge did not err in declining to give the jury instruction requested by NOEHA.
B. Date of valuation
In an expropriation suit, the value of the property must be established as of a certain date. In the instant case, the date of valuation is crucial because N.O. 2000 contends that the property significantly increased in value between the date the expropriation suit was filed (September 10, 1991) and the date of trial (December 18, 1992), due to the state legislatures's approval of riverboat and land-based casino gambling during this period. Accordingly, NOEHA filed a pretrial Motion in Limine which sought to limit the evidence of value to the date on which the expropriation suit was filed. N.O. 2000 responded by filing a Motion for Partial Summary Judgment which sought a ruling that the date of valuation for purposes of determining compensation was to be either the date of trial or alternatively, the date of payment for the property, whichever was later. One month prior to trial, the trial judge, without giving written reasons, denied NOEHA's motion and granted the motion of N.O. 2000. NOEHA filed an application for writs in this court, which we denied on the basis that relator had an adequate remedy on appeal. At the trial on compensation, the trial judge instructed the jury to determine the fair market value of the property "as of the end of this trial today."
NOEHA now reasserts its argument that the trial judge erred in refusing to recognize the date of filing as the proper date of valuation. After reviewing the law, we find that the trial judge did not err.
NOEHA correctly asserts that all the relevant Louisiana jurisprudence holds that the measure of value of property expropriated for public use is the market value of the property at the date of the institution of suit. See State v. Landry, 219 La. 721, 53 So.2d 908, 910 (1951); La. Ry. and Nav. Co. v. Baton Rouge Brickyard, 136 La. 833, 838, 67 So. 922, 924 (1915). However, the Louisiana cases have merely restated a principle first established in the early 1900's. None of these cases has addressed the issue we face in the instant case, which is whether the landowner may be constitutionally deprived of an increase in the value of his property which occurs after the expropriation suit is filed but before he receives payment for the property.
The U.S. Supreme Court addressed this issue in Kirby Forest Industries, Inc. v. United States, 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984), a federal condemnation suit. In that case, the Court first held that, in a "straight condemnation procedure" (one, as here, where suit is filed and the amount of compensation is judicially determined prior to the government's paying for or taking title *1079 to the land), the taking occurs on the date the government tenders payment for the property rather than on the date the condemnation suit is filed. 467 U.S. at 15, 104 S.Ct. at 2197. Moreover, the landowner is constitutionally entitled to the fair market value of his property on the date of the taking. Id., 467 U.S. at 15 at 2197. Therefore, according to the Court, while the date of trial may be used as a convenience, "if the result of that approach is to provide the owner substantially less than the fair market value of his property on the date the United States tenders payment, it violates the Fifth Amendment." Id., 467 U.S. at 17 at 2198. The Court went on to say that in order to satisfy the constitutional requirements, there must be a procedure for modifying a condemnation award (upon motion of the landowner) when there has been a substantial delay between the date of valuation and the date the judgment is paid, during which time the value of the land has changed materially. Id., 467 U.S. at 17 at 2198.
Although Kirby is a federal condemnation procedure, there is no question that the Fifth Amendment also applies to the states. See Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 244 n. 7, 104 S.Ct. 2321, 2331 n. 7, 81 L.Ed.2d 186 (1984); Webb's Fabulous Pharmacies v. Beckwith, 449 U.S. 155, 160, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980). Therefore, although this issue has not been addressed in Louisiana, we conclude based upon Kirby that it would be unconstitutional for the court to set the date of filing as the date of valuation in a regular expropriation proceeding in which the property owner is claiming, as here, that the property has significantly increased in value since the date of filing.
Furthermore, we also find that to value the property on the date of filing under the facts of this case would be a violation of individual property rights under Article I, Section 4 of the Louisiana Constitution of 1974. In 1974, the language of the expropriation clause in the 1921 state constitution giving the landowner the right to "just and adequate compensation" was expanded. This section now includes a provision stating that property shall not be taken without "just compensation" paid to its owner, plus an additional sentence: "In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss." La. Const. art. I, § 4 (1974, amended 1989) (Emphasis added). Interpreting this provision, the Louisiana Supreme Court noted that "the new constitutional language `has broadened the measure of damages in expropriation cases by requiring that an owner not only be paid the market value of property taken and severance damages to his remainder, but also that such an owner be put in as good a position pecuniarily as he would have been had his property not been taken.'" State Through Dept. of Highways v. Constant, 369 So.2d 699, 701 (La.1979) (quoting the majority opinion from the court of appeal, State, Through Dept. of Highways v. Constant, 359 So.2d 666, 671 (La.App. 1st Cir.1978)). Since Constant, appellate courts have relied on this principle to grant compensation for damages incidental to the taking, such as replacement costs of improvements and business losses. See Comment, Compensating an Owner to the Full Extent of His Loss: A Reevaluation of Compensable Damages in Louisiana Expropriation Cases, 51 La.L.Rev. 821, 830-835 (1991).
Although Louisiana decisions have repeatedly assumed, even since the constitutional changes, that the date of taking or date of valuation is the date of filing suit,[5] none of these cases has involved a fact situation such as the instant one; nor has any Louisiana court had occasion to examine the constitutionality of such a rule when applied to this fact situation. In doing so, we hold that under the Louisiana constitution as well as the dictates of Kirby, no actual taking (meaning a transfer of the rights to possession and ownership) can occur until compensation has been paid either to the property owner, or into the registry of the court. See R.S. 19:10, State, Dept. of Trans. & Development v. Sugarland Ventures, Inc., 476 So.2d *1080 970 (La.App. 1st Cir.), writ denied, 478 So.2d 909 (La.1985).[6] Furthermore, both the Louisiana constitution and Fifth Amendment to the United States constitution demand that, if the property has increased (or decreased) in value between the time the expropriation suit was filed and the time of the taking, the property owner is entitled to receive the fair market value of the property at the time of the taking. This right of the property owner completely correlates with the right of the expropriating authority, at any time up until the time of actual payment, even after the rendition of a final judgment in a regular expropriation procedure, to abandon the public purpose behind the expropriation and decline to pay the judgment. See, State, Dept. of Trans. & Development v. Sugarland Ventures, Inc., supra, at 974-975.
Accordingly, we conclude that the trial judge did not err in granting the motion of N.O. 2000, nor in instructing the jury to determine the value of the property as of the date of trial.
C. Evidence of Value
NOEHA claims that the trial court erred by allowing speculative testimony regarding N.O. 2000's future development plans to prove the highest and best use of the property; NOEHA also contends that the trial judge gave improper jury instructions on the concept of highest and best use. Much of NOEHA's argument in this regard is based upon its assertion that the proper date of valuation of the property is September 10, 1991, and its resulting attempts before and during trial to block any evidence of value beyond that date. Our holding that the date of trial was a proper date of valuation implicitly negates this aspect of NOEHA's argument. Moreover, we do not find that the evidence complained of was too speculative to be admissible or that the jury instructions were improper.
The law is that a landowner is entitled to the market value of his property at the time of the expropriation, considered in light of its highest and best use. Board of Commissioners v. Acosta, 562 So.2d 15, 17 (La.App. 4th Cir.1990). Highest and best use is the most favorable employment to which the land is adaptable and to which the property may be put in the not too distant future. Id. All the experts who testified agreed that highest and best use must meet four criteria: (1) physically possible; (2) legally permissible; (3) financially feasible; and (4) maximally productive. All the experts used the comparable sales method to determine value.
Three appraisers who testified for NOEHA opined that the highest and best use of the property in question was to hold for future development. Their independent estimates of the value of the property as of September 10, 1991 were as follows: Mr. Jimmy Thorns, Jr.: $5,534,530; Mr. Robert Merrick: $5,525,000; and Mr. Charles Seymour: $5,250,000. Mr. Thorns also testified that in his opinion, the value of the property had not changed significantly between September 1991 and the date of trial.
John Beckman, an expert in urban planning who testified for N.O. 2000, opined that the highest and best use of the property was a non-industrial multi-use development (hotels, office buildings and high rise residential) based partially upon development plans submitted by N.O. 2000. Two appraisers testifying for N.O. 2000, Mr. Peter Bowes and Ms. Jean Felts, each compiled an estimate of value based upon this mixed use, which they agreed was the highest and best use of the property. Both opined that the market perceptions concerning the prospect of riverboat and casino gambling in this area had significantly increased the fair market value of the property. Both also considered N.O. 2000's development plans in their studies. Their estimates of value as of the date of trial were $28,400,000 (Mr. Bowes) and $32,360,730 (Ms. Felts).
NOEHA's contention that the testimony of N.O. 2000's experts should have been excluded as speculative is based primarily upon NOEHA's assertion that there was no definitive *1081 proof that this type of development could take place in the "not too distant future." Because the term "not too distant future" has no exact definition (although one expert opined it would be within two years), we find that its meaning is a factual determination to be made by the jury. The jury had the responsibility of assessing the credibility of and weighing the testimony of the experts with regard to highest and best use, which is ultimately a question of fact. See: Boem v. Bienemy, 508 So.2d 159, 162 (La.App. 4th Cir.1987); Faustina Pipe Line Co. v. Hebert, 469 So.2d 483, 487 (La.App. 3d Cir.1985). The trial judge did not err in admitting this testimony.
NOEHA also contends that the jury instructions concerning highest and best use were improper and at best, confusing, because the trial judge used several terms interchangeably with "not too distant future." The law is that the jury charges as a whole must fairly apprise the jury of the applicable law. If they do so, the appellate court will not reverse merely because the trial court refused to give all the charges requested or to use the specific language sought by a party. Reversal is warranted only when there is manifest error such as to preclude the jury from reaching a verdict based on the law and the facts. Barnett v. New Orleans Public Service, Inc., 489 So.2d 452, 454-55 (La.App. 4th Cir.1986).
We find no such manifest error created by the jury charges in the instant case. In explaining highest and best use, the trial judge began by stating three times consecutively that the term meant a use to which the property could be put in the "not too distant future." He then repeated the term "not too distant future" twice more later in his instructions. Under these circumstances, we do not find that the substitution of other similar terms, such as "reasonably near future" (used once) and "reasonably foreseeable future" (also used once) or even the single reference to "in the future" would have confused the jury to the point that they did not adequately understand the law. We therefore hold that the trial judge did not err manifestly in his instructions to the jury.
D. Rebuttal Evidence
NOEHA also argues that the trial judge erred in refusing to allow sufficient rebuttal testimony by its expert, Mr. Thorns. During its case in chief, NOEHA presented expert testimony as to the value of the property in September 1991, when the suit was instituted. On rebuttal, Mr. Thorns testified that he had updated his original appraisal to reflect his estimate of the property's value as of the date of trial. The trial court allowed Mr. Thorns to testify as to his opinion that the property had the same value on the date of trial that it did on September 10, 1991. However, the judge refused to allow him to elaborate as to the comparable sales upon which he had based his opinion or to testify about his opinion of the methods used by N.O. 2000's appraisers. The trial judge indicated that he believed this testimony to be cumulative and outside the parameters of proper rebuttal. For its part, N.O. 2000 argued at trial and continues to argue that Mr. Thorns should not have been allowed to testify at all on the issue of value as of the date of trial because NOEHA knew from the outset that the date of trial was the determinative date, and therefore should have presented this testimony as part of its case in chief rather than as rebuttal.
The admission of rebuttal evidence is largely within the discretion of the trial judge. CNG Producing Co. v. Sooner Pipe & Supply Co., 483 So.2d 1215, 1219 (La.App. 4th Cir.), writ denied, 488 So.2d 692 (La. 1986). Although NOEHA clearly had the right to present some evidence in rebuttal to the testimony of experts for N.O. 2000, we do not find that the trial judge abused his discretion in limiting the scope of that evidence as he did. Accordingly, NOEHA's argument is without merit.
E. Motion for Judgment Notwithstanding the Verdict
N.O. 2000 contends on appeal that the trial court should have granted its motion for judgment n.o.v. setting the value of the property at 28,300,000. The motion was based upon N.O. 2000's assertion that NOEHA had failed to introduce any competent evidence as to the value of the property on *1082 the date of trial, which the trial judge had ruled was the appropriate date. Therefore, according to N.O. 2000, the value could be no less than the lowest estimate of its appraisers.
N.O. 2000's argument fails for two reasons. First, its success depends upon the assertion that Mr. Thorns' rebuttal testimony on value should have been excluded, which assertion we have already rejected. We do not believe, as N.O. 2000 suggests, that the law prohibits the expropriating authority from presenting any rebuttal at all in a Title 19 expropriation suit. In this instance, Mr. Thorns' rebuttal testimony was sufficient to create a question of fact for the jury as to value. Secondly, even without this rebuttal testimony, the jury could have reasonably arrived at a value lower than N.O. 2000's lowest estimate by comparing the methods of valuation and the comparables used by NOEHA's experts in its case in chief with those used by N.O. 2000's experts, even though each set of experts used a different date of valuation. We therefore find no grounds for a judgment n.o.v. The trial court properly denied this motion.
Conclusion
Having disposed of the legal arguments made by the parties (with the exception of the award of attorney's fees, which is discussed below), we had to examine the record to determine whether, based on the evidence presented, the jury's factual determination of $13,000,000 as the appropriate compensation was reasonable. After having so examined the record, we do not find the jury's verdict to be unreasonable or manifestly erroneous. There was a tremendous amount of competent but conflicting evidence presented to the jury. Viewing the evidence as a whole, the jury could have reasonably found that the property was worth more than N.O. 2000 paid for it in September of 1991, but less than the estimates of N.O. 2000's experts. Therefore, we affirm the judgment.
Attorney's Fees
N.O. 2000 urges that the trial court erred in failing to consider the amount of attorney's fees owed to it by NOEHA and to award those as part of N.O. 2000's compensation.
La.R.S. 19:8 provides, in pertinent part:
Immediately after compensation has been determined, the plaintiff shall, upon motion of the defendant, present evidence as to the highest amount it offered the defendant for the property prior to trial on the merits. After hearing evidence on the issue, the court shall determine the highest amount offered. If the highest amount offered is less than the compensation awarded, the court may award reasonable attorney fees.
We have held that, where the statutory offer referred to in La.R.S. 19:2.2 is substantially higher than the value as determined by the jury, the trial court should order that the owner be compensated for the attorney's fees it incurred in defending itself in the expropriation action. City of New Orleans v. Condon, 600 So.2d 78, 81 (La.App. 4th Cir.), writ denied, 605 So.2d 1130 (La.1992). We have also held that, in such cases, the land owner "is entitled to" attorney's fees as part of the compensation "to the full extent of his loss" which is mandated by the constitution. Consolidated Sewerage District of the City of Kenner v. Schulin, 387 So.2d 1369, 1372-73 (La.App. 4th Cir.1980); Gravolet v. Board of Commissioners, 598 So.2d 1231, 1236 (La. App. 4th Cir.1992).
In the instant case, as the statutory offer (presumably 5.5 million dollars) was substantially lower than the 13 million dollar jury verdict, the trial judge was obligated to assess attorney's fees. He apparently intended to do so in a separate proceeding, as he attempted to reserve the right to determine attorney's fees in both the judgment on public necessity for expropriation and the judgment on compensation. Because we do not have the evidence before us upon which to base such a determination, we find it appropriate to remand the matter to the trial court for this purpose.
Accordingly, for the reasons given, the judgments of the trial court are affirmed and the matter is remanded to the trial court for *1083 the consideration and awarding of attorney's fees, in accordance with this opinion.
AFFIRMED AND REMANDED.
WALTZER, J., concurs in the results with written reasons.
WALTZER, Judge, concurring in the results.
I concur in the results reached, but would not rely on Kirby Forest Industries, Inc. v. United States, 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) to do so. I find the results reached not manifestly erroneous under Louisiana state law, without resort to Kirby. I find that in accordance with longstanding Louisiana jurisprudence which was unchanged by the 1974 Constitution that the date of valuation is the date of taking which is the date of institution, i.e. filing of suit because the final judgment once final relates back in time to the date of filing. Additionally, I find the amount awarded proper on another basis, even though the trial court erred in instructing the jury that the valuation date was the date of trial, and I would award interest from the date of judicial demand until paid.
Turning first to the Kirby issue, Kirby does not apply because it is a federal court case interpreting a specific federal statute when used by a federal officer as authorized by a specific act of Congress. The statute is specifically limited to appropriations by the federal government, not state, local or parish government and is specifically limited to federal appropriation cases filed in federal district court, not state court as in the instant case.
In Kirby, supra, the Supreme Court stated:

Title 40 U.S.C. § 257, in conjunction with Rule 71A of the Federal Rules of Civil Procedure, prescribes a procedure pursuant to which the United States may appropriate privately owned land by eminent domain. The central issue in this case is whether the manner in which the value of the land is determined and paid to its owner under that procedure ...
The United States customarily employs one of three methods when it appropriates private land for a public purpose. The most frequently used is the so-called "straight-condemnation" procedure prescribed in 40 U.S.C. § 257. Under that statute, an "officer of the Government" who is "authorized to procure real estate for the erection of a public building or for other public uses" makes an application to the Attorney General who, within 30 days, must initiate condemnation proceedings... Rule 71A requires the filing in federal district court of a "complaint in condemnation", identifying the property and interest therein that the United States wishes to take, followed by a trialbefore a jury, judge, or specially appointed commissionof the question of how much compensation is due the owner of the land ...
A more expeditious procedure is prescribed by 40 U.S.C. § 258a. That statute empowers the Government, "at any time before judgment" in a condemnation suit, to file a "declaration of taking signed by the authority empowered by law to acquire the lands [in question], declaring that said lands are thereby taken for the use of the United States." The Government is obliged, at the time of the filing to deposit in the court, "to the use of the persons entitled thereto," an amount of money equal to the estimated value of the land. Title and right to possession thereupon vest immediately in the United States. In subsequent judicial proceedings, the exact value of the land (on the date the declaration of taking was filed) is determined, and the owner is awarded the difference (if any) between the adjudicated value of the land the amount already received by the owner, plus interest on that difference.
Finally, Congress occasionally exercises the power of eminent domain directly ... it sometimes enacts a statute appropriating the property immediately by "legislative taking" and setting up a special procedure for ascertaining, after the appropriation, the compensation due to the owners.
In addition to these three statutory methods, the United States is capable of acquiring privately owned land summarily, by physically entering into possession and ousting the owner. E.g., *1084 United States v. Dickinson, 331 U.S. 745, 747-749, 67 S.Ct. 1382, 1384-1385, 91 L.Ed. 1789 (1947). In such a case the owner has a right to bring an "inverse condemnation" suit to recover the value of the land on the date of the intrusion by the Government. (citations omitted).
The Government's selection amongst ... these various methods of acquiring property is governed, to some extent, by the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601 et seq. The statute enjoins federal agencies, inter alia, to attempt to acquire property by negotiation rather than condemnation, and whenever possible not to take land by physical appropriation §§ 4651(1), (4), (8). In addition, the statute requires a court with jurisdiction over a condemnation action that is dismissed or abandoned by the Government to award the landowner an amount that will reimburse him for "his reasonable costs, disbursements, and expenses" incurred in contesting the suit. § 4654(a).7 [Footnote 7 provides: "We have held that the last-mentioned provision for the reimbursement of costs is a matter of legislative grace, not constitutional entitlement. United States v. Bodcaw Co., 440 U.S. 202, 204, 99 S.Ct. 1066, 1067, 59 L.Ed.2d 257 (1979) (per curiam) ."] The statute does not, however, regulate decisions by the Government whether to employ the "straight-condemnation" procedure prescribed in § 257 or the "declaration of taking" procedure embodied in § 258a.
Petitioner Kirby Forestry Industries, Inc. was a manufacturer of forest products and owned substantial tracts of timberland in Texas. The National Park Service decided to establish a 35,500 acre Big Thicket National Park in the area. The Texas Forestry Association, of which Kirby Forestry is a member, endorsed the proposal and declared a voluntary moratorium on logging in the designated area. From 1967 onward, Kirby voluntarily observed the moratorium and has not harvested the timber crop on its property lying within the area designated by the Park Service. In 1974, Congress rejected the Park Service Plan and enacted legislation creating a much bigger national park, the Big Thicket National Preserve. The statute, Act of Oct. 11, 1974, Pub.L. 93-439, 88 Stat. 1254, 16 U.S.C. § 698 et seq., directs the Secretary of Interior to acquire the land. The Supreme Court further stated:
The Senate Report made clear that, though the Secretary had the authority to acquire individual tracts by declaration of taking, pursuant to 40 U.S.C. § 258a, such a peremptory procedure should be employed only when necessary to protect a parcel from destruction. S.Rep. No. 93-875, p. 5 (1974) ... in the absence of such an emergency, the Secretary would purchase the land using the straight-condemnation method prescribed in 40 U.S.C. § 257.
The U.S. Government initially attempted a negotiated purchase. The negotiations broke down and on August 21, 1978, the United States filed a complaint in condemnation in the federal district court in Texas. A lis pendens was filed and the district court referred the case to a special commission to determine compensation. At trial before the commission, both parties stipulated "today is the date of taking". The commission recommended $2,331,202 compensation. Both parties objected to the commission's recommendation. The federal district court awarded compensation at the recommended amount of $2,331,202 plus 6% interest from the filing date to the date the Government deposited an amount equal to the adjudicated value of the land with the court as provided for under 40 U.S.C. § 258a. 40 U.S.C. § 258a provided as follows at the time that Kirby was decided:
In any proceeding in any court of the United States outside of the District of Columbia which has been or may be instituted by and in the name of and under the authority of the United States for the acquisition of any land or easement or right of way in land for the public use, the petitioner may file in the cause, with the petition or at any time before judgment, a declaration of taking signed by the authority empowered by law to acquire the lands described in the petition, declaring that said lands are thereby taken for the use of the United States. Said declaration of taking *1085 shall contain or have annexed thereto
(1) A statement of the authority under which and the public use for which said lands are taken.
(2) A description of the lands taken sufficient for the identification thereof.
(3) A statement of the estate or interest in said lands taken for said public use.
(4) A plan showing the lands taken.
(5) A statement of the sum of money estimated by said acquiring authority to be just compensation for the land taken.
Upon the filing (sic) said declaration of taking and of the deposit in the court, to the use of the persons entitled thereto, of the amount of the estimated compensation stated in said declaration, title to the said lands in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the United States of America, and said lands shall be deemed to be condemned and taken for the use of the United States, and the right to just compensation for the same shall vest in the persons entitled thereto; and said compensation shall be ascertained and awarded in said proceeding and established by judgment therein, and the said judgment shall include, as part of the just compensation awarded, interest at the rate of 6 per centum per annum on the amount finally awarded as the value of the property as of the date of taking, from said date to the date of payment; but interest shall not be allowed on so much thereof as shall have been paid into the court. No sum so paid into the court shall be charged with commissions or poundage.
Upon the application of the parties in interest, the court may order that the money deposited in the court, or any part thereof, be paid forthwith for or on account of the just compensation to be awarded in said proceeding. If the compensation finally awarded in respect of said lands, or any parcel thereof, shall exceed the amount of the money so received by any person entitled, the court shall enter judgment against the United States for the amount of the deficiency.
Upon the filing of a declaration of taking, the court shall have power to fix the time within which and the terms upon which the parties in possession shall be required to surrender possession to the petitioner. The court shall have power to make such orders in respect of encumbrances, liens, rents, taxes, assessments, insurance, and other charges, if any, as shall be just and equitable.
On March 26, 1982, the United States deposited the total amount of the judgment into the registry of the court, thus acquiring title under the statute. All parties appealed to the Fifth Circuit and then to the Supreme Court. The Supreme Court granted writs to resolve a conflict among the federal circuits. The Supreme Court noted that:
The United States has the authority to take private property for public use by eminent domain (citation omitted), but is obliged by the Fifth Amendment to provide "just compensation" to the owner thereof. "Just compensation ... means... the fair market value of the property on the date it is appropriated. (citation omitted) Under this standard, the owner is entitled to receive "what a willing buyer would pay in cash to a willing seller" at the time of the taking. (citation omitted) If the Government pays the owner before or at the time the property is taken, no interest is due on the award. (citation omitted) Such a mode of compensation is not constitutionally mandated; the Fifth Amendment does not forbid the Government to take land and pay for it later. (citation omitted) But if disbursement of the award is delayed, the owner is entitled to interest...
The Government contended that the date of taking was the date payment was tendered by the United States under the statute which states "Upon the filing (sic) declaration of taking and of the deposit in the court ... of the ... compensation, title ... shall vest in the United States ..." This argument was supported by the Supreme Court's prior statement in Danforth v. United States, 308 U.S. 271, 284, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939) that:

*1086 [u]nless a taking has occurred previously in actuality or by a statutory provision ..., we are of the view that the taking in a condemnation suit under this statute takes place upon the payment of the money awarded by the condemnor.
The Supreme Court further noted:
In response to the contention that such a procedure was unfair, we observed, "`[t]he owner is protected by the rule that title does not pass until compensation has been ascertained and paid ...'"
Kirby argued that
... the owner is effectively deprived of all of the significant interests associated with ownership long before the Government tenders payment. The filing of a complaint in condemnation and a notice of lis pendens, ... has the effect of preventing the owner of unimproved land thereafter from making any profitable use of it, or of selling it to another private party. (At 2196).
Kirby differs from the instant case in that the Kirby land was raw forest land which may have had potential use as a subdivision due to the growth of the residential areas surrounding nearby Beaumont, Texas. The land in the instant case already has streets, curbing, drainage, sewer lines, utility lines, and street lights, although there are no permanent buildings thereon. Additionally, the land in the instant case was in fact sold to Cannizzaro and his investors by the owner Missouri Pacific Railroad Company after the expropriation suit was filed.
The court in Kirby further noted:
If petitioner's depiction of the impairment of its beneficial interests during the pendency of the condemnation suit were accurate, we would find its constitutional argument compelling ... However, we do not find, prior to the payment of the condemnation award in this case, an interference with petitioner's property interests severe enough to give rise to a taking under the foregoing theory. Until title passed to the United States, petitioner was free to make whatever use it pleased of its property. The Government never forbade petitioner to cut the trees ... Nor did the Government abridge petitioner's right to sell the land if it wished. It is certainly possible ... that the initiation of condemnation proceedings, publicized by the filing of a notice of lis pendens, reduced the price that the land would have fetched, but impairment of the market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking. (citations omitted) At lease in the absence of an interference with an owner's legal right to dispose of his land, even a substantial reduction of the attractiveness of the property to potential purchasers does not entitle the owner to compensation under the Fifth Amendment. (At 2196-7).
Having resolved that issue, the Kirby court then stated:
The foregoing conclusion does not dispose of this case. We still must determine whether the award itself satisfied the strictures of the Fifth Amendment. ... petitioner is constitutionally entitled to the fair market value of its property on the date of the taking.

The difference between the instant case and the Kirby case boils down to a difference between federal appropriation and state expropriation law. Under the federal law, the date of filing of the case, also known as the date of institution of suit, can be a different day from the day of taking and a different day from the day of valuation and a different day from the day of judgment and a different day from the day of payment and a different day from the day title passes. Under state law all of these days will always be on the same day, namely the day the suit is filed, because our final judgment relates back in time to the day suit was filed which also becomes the day title passes and the day of taking. Thus it meets the constitutional requirement that "petitioner is constitutionally entitled to the fair market value of its property on the date of the taking." Louisiana petitioners always receive fair market value on the date of the taking, because the valuation date, i.e. date of filing of case, and the date of the taking, i.e. date of filing of case, are always the same. Additionally, under Louisiana law, interest is awarded from date of judicial demand, i.e. the day the case is filed, until paid. Matter of Clark, 960 F.2d 475 (5th Cir.1992).
*1087 The court in Kirby noted the practical problems of ascertaining fair market value and valuation date.
... it is imperative that the trier of fact in a condemnation action be given a fixed date as of which the value of the land is to be assessed. At the time of trial, no one knows when the United States will exercise its option to purchase the property, so adoption of the date of payment as the date of valuation is infeasible. Moreover, prediction of the value of land at a future time is notoriously difficult. Under these circumstances, courts and commissions understandably have adopted the convention of using the date of the commencement of the trial as the date of the valuation.
The Supreme Court is correct in its statement that it is an absolute necessity that there be a specific fixed date on which valuation is made. On practical reason for this necessity is the lag time that it takes for an appraisal to be prepared. The highest professional designation of an appraiser is an M.A.I. or Member Appraisal Institute. The M.A.I. designation is awarded only after years of course study, field experience, and successful completion of many levels of tests. The Appraisal Institute was founded in 1933 as a result of the crash of 1929 which was due in part to the sale of assets without appraisals or with artificial values arbitrarily set. M.A.I.s appraise only in conformity with the formulas and standards of the Institute. According to M.A.I. standards, there are 4 methods of appraisal: the cost approach, the sales comparison approach, the income approach and the development approach. The cost approach is replacement or reproduction cost of improvements new less depreciation plus on site improvement and land value. Depreciation consists of physically curable (deferred maintenance), physically incurable (effective age of the building divided by economic life) functional obsolescence (replacement cost does not exist), and external obsolescence (market rents have dropped, character of the neighborhood changed, market changes outside of the property itself). The sales comparison approach uses comparable units of comparison (square feet, linear feet, apartment units, etc.) and elements of comparison (age, location, condition, size, land to building ratio, etc.) The development approach is the most complex. The development approach begins with a marketability or feasibility analysis in order to determine what is the supply and demand in the area or even if there is a supply or a demand in an area. The appraiser then asks what is the highest and best use of the property by examining the use of the property surrounding it. Then the appraiser uses a sales comparison approach to determine how many lots it can be subdivided into, sets the retail lot value including street length and width, cost per linear foot to install streets, drainage, etc., costs of subdivision, including costs of zoning changes, if necessary, etc. and projects a sell out calendar and sell out time per lot. In the development method, the question asked is how much is it worth to a developer who will survey, layout, subdivide, etc. with an expected rate of return. In each method of appraisal, the appraiser runs real estate transfers for the past year back from the date of valuation and plots on a plot plan what has been sold in the geographic neighborhood in order to obtain comparables. It is apparent that it takes the appraiser time to compile the information, run the math formulas and issue his appraisal value as of a specific date. The federal court's adoption of the convention of the date of trial as the valuation date insures that the appraisal is always incomplete because the appraiser does not have the benefit of the sales made on the day of trial which is also the day of valuation because his report must be completed before trial. Therefore there is always a hole in his information and an unaccounted for period of time. If the appraiser is testifying on the day of trial, he clearly cannot give an informed opinion as to the value as of that same day because the information will of necessity be incomplete. Even as he testifies a comparable sale may simultaneously be taking place which would have changed his value, had he but known. Louisiana law completely avoids the problems found in Kirby.
Turning to the instant case, this writer believes that the award of 13 million was not an abuse of discretion by the trier of fact. Missouri Pacific had agreed to a sale price of 12 million to the City, but the City backed *1088 out of the agreement. Later a firm price of 11 million was reached, but neither the City nor New Orleans Exhibition Hall Authority confected the sale, but rather continued attempting to lower the price. The City continued attempting to cut the price by seeking to purchase only certain specified acreage. Missouri Pacific wanted to sell the whole parcel. Eventually, Missouri Pacific sold the tract to Cannizzaro and his investors for 11 million after it turned down his 10 million offer for the entire tract. Negotiations revealed that there were environmental problems on the property stemming from its prior use. Estimates range from 1 million to 5 million for the environmental cleanup. It appears to this writer that the jury awarded 11 million plus 2 million for environmental clean up. The award is supported by the record and clearly not an abuse of discretion.
Finally I would note that under Louisiana law interest on the 13 million is due from the date of judicial demand until paid. I concur in remanding the issue of attorneys fees to the district court for a hearing.
ON REHEARING GRANTED
We grant NOEHA's application for rehearing for the limited purpose of clarifying our prior remand order. On rehearing, we remand the matter to the trial court for the purpose of determining and assessing attorney's fees, costs and any applicable interest. In all other respects the judgment remains unchanged.
NOTES
[1] N.O. 2000 also argues that truck marshalling cannot be allowed because it conflicts with the Riverfront Strategic Policy Plan. However, because this policy plan was not yet adopted by the City Planning Commission at the time of trial, it did not have the effect of law.
[2] La.R.S. 48:441 et seq. allows the state to expropriate property in an expedited procedure in which the estimated compensation to the owner is deposited in the registry of the court before the trial is held.
[3] The quote originally comes from the court of appeal decision in State v. Patout, 236 So.2d 40, 48 (La.App. 3d Cir.1970), a companion case to Vermilion, which was also reversed by the Supreme Court, 249 So.2d 179 (La.1971).
[4] Article 1 § 2 of the Louisiana Constitution (prior to its amendment in 1974) provided:

Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid.
The changes made on this subject in the 1974 Constitution are discussed at page 11, infra.
[5] See, e.g., City of New Orleans v. Giraud, 346 So.2d 1113, 1118 (La.App. 4th Cir.), writ denied, City of New Orleans v. Wiener, 349 So.2d 884 (La.1977) and Giraud v. City of New Orleans, 362 So.2d 579 (La.1978), and cases cited therein.
[6] See also R.S. 48:441 et seq. Payment into the registry of the court is the norm in "quick-taking" cases, which procedure has been held to be constitutional. See State, Dept. of Highways v. Olinkraft, 350 So.2d 865 (La.1977).